## DU BOIS NAT. BANK v. HARTFORD ACCIDENT & INDEMNITY CO.
### No. 9147.

Circuit Court of Appeals, Third Circuit.

Argued Oct. 22, 1946.

Decided April 21, 1947.

Gifford K. Wright, of Pittsburgh, Pa. (George F. Taylor and Alter, Wright & Barron, all of Pittsburgh Pa., on the brief), for appellant.

John J. Pentz, of Clearfield, Pa. (Pentz & Silberblatt, of Clearfield, Pa., and Joseph E. Madva, of Pittsburgh, Pa., on the brief), for appellee.

Before BIGGS, ALBERT LEE STEPHENS and KALODNER, Circuit Judges.

ALBERT LEE STEPHENS, Circuit Judge.

This action of assumpsit was brought in the Court of Common Pleas of Clearfield County, Pennsylvania, in July, 1943. A statement of claim was filed in July, 1944, and the case was thereafter removed to the United States District Court for the Western District of Pennsylvania because of the diversity of citizenship of defendant. The case was tried to a jury, and a judgment was entered for the plaintiff. Judge F. P. Schoonmaker, who presided at the trial, died soon after the conclusion of the trial, and Judge R. M. Gibson heard and decided the "Motion to Set Aside the Judgment and for Judgment." The defendant appeals from the judgment. We shall occasionally refer to plaintiff-appellee as the bank and to defendant-appellant as the insurer.

On July 1, 1940, the insurer issued two insurance bonds to the bank, one entitled a "Primary Bankers Blanket Bond", in the amount of $25,000, and the other was called "Excess Bond, Form No. 2". The court is concerned only with the Primary Bankers Blanket Bond, by which the insurer obligated itself to protect the bank for "Any loss through any dishonest, fraudulent or criminal act of any of the employees, including loss of property through any such act of any of the employees, whether any such act may be committed and whether committed directly or by collusion with others."

W. G. Brown became connected with the plaintiff-bank in 1905 as an ordinary clerk,

and through successive steps became its president, officiating in that office until he resigned August 20, 1942. Sometime prior to 1942, the bank began doing business with the Producers Economy Coal Company, operated by C. E. Lovejoy. During the month of January, 1942, the coal company's account with the bank showed an indebtedness of a few dollars less than $39,000—the legal limit permissible being $40,000. The indebtedness was secured on its face by notes, which were purported to be secured by assigned accounts for coal purchased by third parties. These accounts were largely fictitious. In addition, however, to the indebtedness evidenced by the notes, President Brown permitted the coal company to overdraw its open checking account by many thousands of dollars and caused the overdrafts to be carried on the bank books as "cash items".

On July 30, 1942, a bank examiner discovered the overdrafts, which on that date amounted to $27,192.35. The cashier and two assistant cashiers were aware of these "cash items", and they had spoken of them to Brown, who assured them that they would be "taken care of." The members of the Board of Directors, other than Brown, denied any knowledge of them prior to the time the bank examiners discovered them. However, W. J. Schoch, having learned something of the situation, wrote to the insurer under date of August 16, 1942, informally suggesting that there were some irregularities at the bank, and on the same date the bank directors discussed the overdrafts, which then totaled the sum of $39,040.43. It may be noted that Schoch had acted as the insurers sales agent in the sales of the insurance bonds to the bank.

Prior to the July 30, 1942, meeting, the president of the bank had secured a bill of sale of the assets of the coal company, which he held for the use of the bank, and the Board of Directors on August 7, 1942, decided to take over the coal company, to sell part of its assets, and continue the business to salvage some or all of the loss. While operating the coal company, additional overdrafts were honored after July 30, 1942. The bank, in August, 1942, sold certain coal company equipment, and out of the proceeds paid equipment lien holders, and also paid off the overdrafts honored after July 30, 1942, in the sum of $14,480.-93, together with a portion of the overdrafts of a prior date.

On August 18, 1942 the Chief National Bank Examiner requested Brown's resignation, and two days later Brown resigned to the Board of Directors. J. W. Schoch, then Vice-president, became the bank's executive head, and acted in that capacity until George W. Yohe qualified as President, November 1, 1942.

It was not until October, 1942, that Mr. Waddell, the Chief Claims Attorney for the insurer, sent Mr. Hannon to the bank in response to Mr. Schoch's communication. Mr. Hannon was a regular employee of the insurer, and aided Mr. Waddell in this manner when the latter could not himself attend to matters demanding attention.

Mr. Hannon was fully informed as to the indebtedness, the assumption of the coal properties, and the sales and distribution of funds received. Mr. Hannon's visit occurred within the ninety-day period provided in the insurance contract for proof of loss after its discovery.

There is testimony to the effect that Mr. Hannon agreed that the bank should continue with the liquidation of the coal company, and that the bank could not file a detailed proof of loss because the amount was yet undetermined. Mr. John S. Horner, assistant cashier of the bank, testified:

"Q. Did you show that [audit of coal company] to Mr. Hannon? A. I don't recall that I showed it to him. I discussed it with him. I had it there.

"Q. Did you tell him what the report was? A. Yes, sir.

"Q. What? A. The auditor's report we had showed that based on the information given to the engineers of the Freeport Corporation, the engineers estimated there was at least 50,000 tons of coal there and it could be mined at approximately 75 cents a ton.

"Q. What did Mr. Hannon say in response? A. He agreed it was a good idea that we took over the Coal Company and of course we couldn't file proof of loss or establish proof of loss until we knew what it was.

"Q. What did he say in respect to that? A. He told me we couldn't file proof of loss unless we knew what the loss was.

"Q. At that time, did you know what the loss was? A. No.

"Q. Why not? A. Because we had taken over the Producers Economy Coal Corporation and they had certain assets and this report of the auditors, based on the engineers' report, led us to believe that possibly we could recover some of the loss through the operation of the Coal Company, and that's what we were proceeding to do.

"Q. Were you in the Bank when the Bank Examiner came? A. I wasn't in the Bank that day.

"Q. Now then, when Mr. Hannon came up in August, 1942, did you disclose that to him? A. Yes, sir.

"Q. What did he say about this? A. I don't recall what he said. We went over the whole thing; explained what happened—what led up to it.

"Q. And what was his final statement? What did he say to you? A. His final statement was 'Of course, you can't file a proof of claim until you know what your loss is.' He commented, 'You may make some money from the Coal Company.'"

The bank continued to operate the coal company, and it was not until March or April, 1944, that it was possible to determine the loss, as Mr. Yohe testified, "with a certain accuracy", and on May 5, 1944, the total loss was determined to be $43,757.67, made up of $21,201.50 cash items and $22,374.17 on the notes. Upon this accounting and upon this date the bank tendered its proof of loss, which was declined reception by the insurer.

The jury returned a verdict for loss on the cash items, and responded in the negative to the following special interrogatory: "Is the defendant liable for payment of the whole or any part of the note obligations?" The negative answer to this interrogatory, of course, meant that the jury did not find that any dishonesty on the part of Mr. Brown was practiced in the business transactions connected with the notes.

The insurer contends: The action was prematurely brought; the bank failed to file proof of loss within ninety days from the date of discovery thereof, as required by the insurance policy; the evidence failed to establish that the bank relied on any waiver of the time of filing proof of loss; and the bank had not properly apportioned the moneys received for credit to the coal company on cash items entered after July 30, 1942.

Suit was filed within the fifteen months from the discovery of irregularities and resulting probable loss as required by the bond, but formal proof of claim was not filed until after that date, and it is, therefore, claimed that the beginning of the action was premature. In response, the bank argues that the insurer having failed to plead prematurity, and having consented to a delay of the formal proof of loss until the amount of such loss could be determined, and notice of the irregularities having already been tendered appellant, the objection is merely technical and without merit.

Upon the subject of prematurity, the insurer calls attention to the fact that in its answer it set forth that "The plaintiff fails to state a claim against the defendant upon which relief can be granted." It argues that that allegation is sufficient to raise the issue of prematurity since the suit was filed before the formal proof of loss had been presented. In the opinion of the judge who heard the motion, the allegation relied upon as supporting a claim of prematurity was too general to acquaint the court with a technical objection of this nature. There appears to have been no objection made at or during the trial as to prematureness except as to the Excess Bond. Should insurer have desired to rely upon his allegation that no sufficient claim had been filed, it should have informed the court. Instead, it merely injected an objection to the Excess Bond and proceeded throughout the trial with no other objection directed to prematurity. At the time of trial the claim had been furnished the insurer, and there is not a word as to any prejudice suffered by it through the fact that the formal filing of the suit preceded the statement of exact loss. We are in entire agreement with Judge Gibson's conclusion.

██ The insurer's second point is related to the first point and is that the bank failed to file proof of loss within ninety days from the date of discovery thereof as required by the policy. It is implicit in the verdict that the jury thought the insurer had waived this provision, and we think there is substantial evidence in the case to support such conclusion.

The third point made by the insurer rests upon a claim that the bank failed to rely upon the waiver. It is said that the bank failed to claim the waiver for two years and asserted it for the first time but a few weeks before trial. These claims, if pertinent, are evidence that no waiver was made. However, relevant and substantial evidence was introduced to prove the claimed waiver, and it is implicit in the verdict that the jury thought there was such waiver.

██ It is not necessary that the bank be misled to its prejudice before an act will constitute a waiver. The insurer having voluntarily relinquished a known right, the waiver was complete without further condition. In its argument, insurer seems to confuse the doctrine of waiver with that of estoppel. It is stated in Globe Indemnity Co. v. Cohen, 3 Cir., 106 F.2d 687, 691: "Estoppel may be described as an intentional relinquishment of a known right by a party *for a consideration*. Waiver may be defined by omitting the last three words of the preceding sentence." (Emphasis ours.) See Vance on Insurance, 2d Ed., p. 451. The waiver was complete on October 6, 1942, and at that time the acting head of the bank and other members were fully aware of the waiver, and their reliance upon the waiver was that of the bank's.

It is claimed by the fourth point that the bank did not properly apportion the moneys received for credit to the coal company after July 30, 1942, the date on which the bank examiner informed the Board of Directors of the irregularities in the accounts. It is claimed that any losses due to overdrafts following that date were not covered by the bond. The overdrafts permitted after that date amounted to $14,480.93. The basis for such overdraft account is as follows.

In August of 1942 the bank, having taken over the operation of the coal company, sold parts of the equipment and deposited the proceeds in the bank under the coal company's general checking account. A portion of these proceeds was paid to conditional vendors to release the coal company equipment from purchase liens, another portion was released to pay third party general creditors of the coal company and for working capital, another portion was credited against the overdrafs permitted after July 30, 1942, and another portion was used to cancel off part of the overdrafts honored prior to July 30, 1942. After these allocations of money received had been made, the sum of $21,001.50 of the earlier overdrafts remained unpaid.

It is contended that since the bank did not appropriate the fund to either the secured or unsecured indebtedness of the coal company when it received the money from the sale of equipment, but instead charged it to the debtor's general checking account, the bank relinquished its right to appropriate the fund to either secured or unsecured claims. The argument is that credits are deemed to have been made in extinguishment of the earliest liabilities of a running account in the absence of a special allocation at the time of the receipt of the credit. 1 Morse on Banks and Banking, 832.[1] It is the allocation to third parties and to working capital and the payment of overdrafts made subsequent to July 30th that are complained of as prejudicial to the surety company. In the circumstances obtaining, the insurer claims that in the absence of allocation to some particular indebtedness at the time of the deposit, the credits in a running account satisfy the earliest liabilities; that the special allocations were made too late to prevent such result, and that they were improper as a release of collateral.[2] If

---

[1] "It is presumed that a deposit made subsequent to an overdraft is received toward the payment of such overdraft."

[2] The appellant in his brief asserts that "The total amount of money wrongfully by law disbursed is $32,167.28 [the appropriation of $17,686.35 to pay third parties and for working capital and the payment of overdrafts amounting to $14,480.93]; it constituted a release of security, as this money was the proceeds of sale of equipment which the bank held

insurer is right upon this contention, the $20,001.50 allowed by the jury as the sum of Brown's dishonest transactions would have been cancelled, thereby eliminating the obligation of the surety company.

The bank in taking over the operation of the coal company sought to retrieve the losses incurred through loans to it. There is evidence to the effect that the bank directors as a board did not attribute dishonesty to Brown until his resignation was requested by the examiner, and that the overdrafts from July 30th to August 18th were permitted by the directors in good faith to meet coal company payrolls and prevent cessation of production. The distribution of the receipts was fully disclosed to the insurer's agent, who acquiesced therein and approved the efforts of the bank in liquidating the coal company. The insurer, aware that the bank was relying upon its insurance bond, and being fully informed, plainly indicated its approval of the methods adopted by the bank to lessen the losses.

■ If, in ordinary transactions, a deposit to a general account fixes its allocation to the earliest item of the debt, we think the exceptional circumstances herein set forth make the rule inapplicable. The evidence undoubtedly supports the thesis that the money received was deposited in the account as a current bookkeeping procedure in the course of allocating it as the bank thought proper.

It may be assumed that the rule has been correctly stated by insurer, and that it applies in cases where the payor of the money, the debtor, is separate and distinct from the receiver, the creditor. However, in the instance before us the debtor and creditor were one for all practical purposes, and since insurer had consented to the bank's handling of the business, it would seem that it, too, was included. All three in fact were acting as a unit in an effort to lessen or wipe out the losses.

■ If on the other hand the bank be considered the creditor and the coal company its debtor, either one would have the right to designate the application of the fund paid, and the law does not do so unless both parties fail to make a designation. In the instant case the bank made the application. See Woods Trust, 350 Pa. 290, 294, 38 A.2d 28, 30. [3]

The dishonesty of Brown as the basis of the losses for which recovery was adjudged is not questioned in this appeal.

In all parts of this opinion in which we have referred to factual matters as proved, we have, of course, followed the rule that the jury found those facts which are necessary to support the verdict. We have weighed the evidence only as to its substantiality.

We add, with propriety we think, that Judge Gibson very ably performed the task of passing upon the "Motion to Set Aside the Verdict and for Judgment", which was made more difficult by the fact that he did not preside at the trial of the case.

We find no error, and, therefore, the judgment is affirmed.

---

as collateral security. 'The wrongful surrender of collateral security by a creditor without the knowldege of sureties for the payment of the debt discharges them from liability therefor entirely or pro tanto, according to the value of the security thus surrendered.' Brown v. First National Bank of Newton, 8 Cir., 132 F. 450, at page 455."

[3] The cited case quotes from Page v. Wilson, 150 Pa.Super. 427, 433, 28 A. 2d 706, as follows: " 'The debtor has a right to make the application, in the first instance, and failing to exercise it, the same right devolves on the creditor.

When no application is made by either party, the law determines how the payments are to be applied in accordance with equitable rules and principles, and primarily, it deems the payments to have been made in discharge of the earliest liabilities of a running account—each item of credit is applied in extinguishment of the earliest debit items in the account; in other cases, it will apply the payment, when not appropriated by either party, in the way most beneficial to the creditor, that is, to the *debt least secured*, unless to the prejudice of a surety.' "