In re LEASE–A–FLEET, INC., Debtor.

**Bankruptcy No. 91–12996S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Sept. 26, 1991.

Jonathan H. Ganz, Rawle & Henderson, Philadelphia, Pa., for debtor.

Karen Lee Turner, Dechert Price & Rhoads, Philadelphia, Pa., for Lauderhill.

Domenic Pacitti, Lesser & Kaplin, P.C., Blue Bell, Pa., for Meridian Bank.

David E. Fraimow, Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., for United Valley Bank.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, Pa.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The parties to the instant dispute agree that the result requires application of Pennsylvania law regarding allocation of payments made on account. We believe that the overriding relevant legal principle of that law is that, in the absence of an express contract to the contrary, the obligor has the right to dictate the allocation of payments. We find, on the basis of the present record, that, as to each of the three factual settings in issue, there was no express contract relative to allocation, and that the respective obligors' manifested intentions to allocate payments to their post-petition indebtednesses to the obligee-Debtor controls their disposition. Therefore, we

conclude, on this record, that Morse Operations, Inc. d/b/a Lauderhill Leasing ("Lauderhill") is entitled to prevail in asserting its entitlement to each of the payments in issue as against the rights thereto of United Valley Bank ("UVB") and Meridian Bank ("Meridian") (collectively UVB and Meridian are referred to as "the Banks").

## B. FACTUAL AND PROCEDURAL HISTORY

LEASE–A–FLEET, INC. ("the Debtor") filed the voluntary Chapter 11 bankruptcy case underlying the instant dispute on May 30, 1991. The business of the Debtor was serving as an intermediate lessor-lessee of motor vehicles between vendor-manufacturers of motor vehicles and relatively small auto rental companies who dealt with the public. The Debtor provided fleets of vehicles to such small rental companies.

In recent years, the Debtor, rather than obtaining its vehicles directly from vendor-manufacturers, had contracted to obtain all of its vehicles from Lauderhill, which was also a competitor of the Debtor as an intermediate lessor-lessee of vehicles. Depression in the auto-rental industry in Florida, where many of the Debtor's customers were located, had resulted in payment defaults, and in some cases bankruptcy filings, by some of the Debtor's largest customers. This, in turn, caused the Debtor to fall behind in payments to Lauderhill. Lauderhill then threatened action to recover its vehicles leased to the Debtor, which constituted virtually all of the Debtor's fleet. Litigation in the Pennsylvania and Florida state courts, featuring cross-accusations of unfair practices between the Debtor and Lauderhill, preceded the bankruptcy filing.

On May 31, 1991, the day after the Debtor's filing, Lauderhill filed a comprehensive motion seeking, *inter alia*, relief from the automatic stay to recover its vehicles, recovery of adequate protection payments, and the appointment of an examiner. On June 6, 1991, the designated expedited hearing date, these parties reported an interim settlement, which included promises of the Debtor to make certain payments to Lauderhill and of Lauderhill to restrictions in doing business with certain of the Debtor's customers. This truce proved to be uneasy, because the parties never did agree on the nature of Lauderhill's remedies in the event of the Debtor's default.

The continuing attempts of Lauderhill and the Debtor to reach a firm agreement culminated in a proposed Consent Order, presented to the court on July 15, 1991. Appearing and opposing certain aspects of the Consent Order were the Banks, which had made the loans (UVB—late 1989, $600,-000; Meridian—spring, 1990, $500,000; Meridian—fall, 1990, "standby credit" of $1,000,000) to the Debtor secured by the Debtor's accounts receivable. All parties ultimately agreed to the form of Order which provided Lauderhill with a right to recover about seventy-five (75%) percent (later determined to be 75.8%) of certain post-petition rental payments received by the Debtor from its customers, but would, by implication, allow the Banks to enforce their respective security interests and recover all pre-petition rental payments received by the Debtor.

The Debtor defaulted on the terms of the July 15, 1991, Order almost immediately thereafter. Lauderhill, on July 25, 1991, moved to enforce those terms of the Order providing that it would be granted relief from the automatic stay to pursue collection of post-petition rental payments due to the Debtor in the event of default. On August 6, 1991, the Banks jointly moved for relief from the stay to pursue collection of pre-petition rental payments made to the Debtor. The Debtor failed to appear at a hearing on August 14, 1991, on Lauderhill's motion. By agreement of Lauderhill and the Banks, we entered an Order on August 20, 1991, granting relief from the automatic stay and other relief provided in the Order to Lauderhill. However, in that Order, we also scheduled a hearing on September 4, 1991, the date that the Banks' joint motion for relief was already scheduled, for the purpose of resolving disputes regarding the relative rights of the Debtor, Lauderhill, and the Banks to certain payments received by the Debtor. The Debtor

was directed to appear and indicate what its records showed as to these payments.

At the outset of the proceedings on September 4, 1991, we granted the Banks' unopposed motion for relief from the automatic stay. Lauderhill and the Banks then stipulated that their differences were confined to three payment transactions (one of which was a series of transactions). Lauderhill and the Debtor also expressed a point of difference over interpretation of the July 15, 1991, Order, i.e., whether or not Lauderhill was entitled to recover the 75.8% of post-petition payments received by the Debtor after Lauderhill was granted relief from the automatic stay on August 20, 1991. This dispute raised a question about certain payments on two accounts. Testimony relevant only to the disputes between Lauderhill and the Banks was adduced from Gerald Monagle, the Debtor's Controller; Steven Wolk, the Debtor's President; and Dennis J. Fedorovich ("Fedorovich"), the Controller of related businesses which were customers of the Debtor known as Lindo's Rent-a-Car, Inc. ("Lindo's") and Scamp Auto Rental d/b/a Dollar Rent A Car ("Scamp").

After the hearing, we entered an Order of September 5, 1991, resolving the dispute between Lauderhill and the Debtor in the Debtor's favor, holding that the panoply of relief accorded to it by relief from the stay was all that Lauderhill was entitled after it obtained relief from the stay, rather than having the right to recover 75.8% of the post-petition payments in issue as well. The Order also provided that Lauderhill and the Banks had the opportunity to file Opening Briefs on or before September 13, 1991, and Reply Briefs on or before September 20, 1991, supporting their respective positions as to their dispute. Both of these entities filed Opening Briefs, but only Lauderhill filed and served a Reply Brief.

## C. RELEVANT FACTS

Most of the facts are not in dispute. The common owner of Lindo's and Scamp was identified as Don Lindo ("Lindo"). In March, 1991, Lindo transferred possession, custody, and control of most of the motor vehicles leased by Lindo's from the Debtor to Scamp pursuant to an agreement of Lindo's to sell its assets to Scamp. Fedorovich testified that the Lindo's vehicles were transferred to Scamp as an accommodation to the Debtor, since the vehicles leased by Lindo's from the Debtor were not eligible to be "defleeted," i.e., repossessed by the Debtor, even if payment were not made to the Debtor, because they had been leased too recently to permit this remedy. Although the Debtor assumed that Scamp had executed an agreement to assume Lindo's debts, the Debtor treated Scamp as a separate customer with a separate account and account number distinct from its account for Lindo's. However, no lease or other contract was ever executed between the Debtor and Scamp.

The first two disputed payments involve, respectively, the June, 1991, and July, 1991, payments from Lindo's/Scamp to the Debtor. In response to an invoice of the Debtor setting forth the amount due on the Scamp account for June, 1991, as $234,111.78, Scamp issued its own check in that precise amount to Lindo's, which Lindo's in turn endorsed to the Debtor. There was no cover letter accompanying the check. The Debtor initially deposited the check into a separate account maintained for post-petition payments, and credited Scamp's account on its books. The Debtor also sent a statement of account to Scamp crediting Scamp for the payment.

In mid-July, 1991, Lauderhill's counsel (ironically) pointed out to the Debtor that it had no written contract with Scamp, as opposed to Lindo's. The Debtor then proceeded to transfer the $234,111.78 payment to the Lindo's pre-petition account, where it ultimately determined that it belonged.

The second payment in issue is the July, 1991, payment from Lindo's/Scamp. The Debtor, as in June, billed Scamp directly, in the amount of $174,365.03. Scamp, after receiving the bill, issued its cashier's check to Lindo's. Lindo's then issued its own cashier's check to the Debtor in payment. A check in the amount of $174,365.03 was thus sent to the Debtor by Lindo's with a copy of a letter from Scamp to Lindo's

requesting Lindo's to make the payment to the Debtor for its July invoice. The check from Lindo's to the Debtor contained the inscription "July payment for Dollar." "Dollar" was a name in which Scamp, but not Lindo's, did business. By this time aware that it had no written contract with Scamp, the Debtor applied the check to its oldest Lindo's receivables and deposited the check into its pre-petition account.

The third payment in issue involves a series of payments from another customer of the Debtor, a company identified as Global/USA or USA Rent A Car System (referred to hereafter as "USA"). USA was already in bankruptcy when it leased vehicles from the Debtor during the pertinent period, and its payments to the Debtor were made by USA's bankruptcy trustee, Alvin Bernstein ("the Trustee").

On or about July 3, 5, 8 and 16, 1991, the Debtor received four checks from the Trustee's agent bearing those dates from USA, aggregating $144,785.99. Each check was accompanied by a letter from the Trustee's office which referenced the invoice to which the check was to be applied. Each letter referenced a post-petition invoice. Nevertheless, the Debtor applied these checks to other, pre-petition USA receivables and deposited the checks in its pre-petition account.

Subsequent to the September 4, 1991, hearing, the Banks submitted an Affidavit executed by Wanda Hagan Anthony, Esquire ("Anthony"), identified as the Debtor's attorney in the USA bankruptcy. This Affidavit recites an agreement of July 2, 1991, with the Trustee that

(a) USA will report to [the Debtor] only how USA internally applies the monies paid, (b) USA will not attempt to direct how [the Debtor] should apply the monies on its books to USA invoices, and (c) USA would change its cover letters accordingly.

Lauderhill refused to agree to allow this Affidavit to be admitted into the record and protested its admissibility on the ground that it was double hearsay, *i.e.*, the declarant was the Trustee, whose words are related through another declarant (Anthony),

and neither Anthony nor the Trustee were available to Lauderhill for cross-examination.

## D. DISCUSSION

As in *In re Comer*, 716 F.2d 168, 175 (3d Cir.1983),

[t]here appears to be little dispute between the parties that the applicable law on the substantive issue of allocation was stated by the Superior Court of Pennsylvania in *Page v. Wilson*, 150 Pa.Super. 427, 433, 28 A.2d 706, 709 (1942), and later quoted with approval by the Pennsylvania Supreme Court in *Woods Trust*, 350 Pa. 290, 294, 38 A.2d 28, 39 (1940). The rule is stated as:

"The debtor has the right to make the application in the first instance, and failing to exercise it, the same right devolves upon the creditor. When no application is made by either party, the law determines how the payments are to be applied in accordance with equitable rules and principles. . . .
[I]t will apply the payment, when not appropriated by either party, in the way most beneficial to the creditor, that is, to the debt lease secured, unless to the prejudice of a surety."

*See also Toll–Barkan Co. v. Toll*, 193 Pa.Super. 221, 225, 164 A.2d 36, 38 (1960); RESTATEMENT (SECOND) OF CONTRACTS §§ 258, 259, 260 (1982) [cited hereafter as "Restatement"].

*Accord, e.g., Pristas v. Landaus of Plymouth, Inc.*, 742 F.2d 797, 801 (3d Cir.1984); *DuBois Nat'l Bank v. Hartford Accident & Indemnity Co.*, 161 F.2d 132, 137 (3d Cir.1947); *Delaware Dredging Co. v. Tucker Stevedoring Co.*, 25 F.2d 44, 46 (3d Cir.1928); *In re Penn Jersey Corp.*, 72 B.R. 981, 983 (Bankr.E.D.Pa.1987); *Washington Natural Gas Co. v. Johnson*, 123 Pa. 576, 593, 16 A. 799, 801–02 (1889); *Harker v. Conrad*, 5 SERG. & RAWLE 301, 305 (Pa.1825); *Uhl Constr. v. Fidelity & Deposit Co. of MD.*, 371 Pa.Super., 520, 526, 538 A.2d 562, 565 (1988); and 29 P.L.E. 162 (1960).

██ We find that there was an application or allocation by the customer or obli-

gor in each of the three payment scenarios in issue. The allocation directed by the obligor in each instance was that each payment be applied to post-petition indebtednesses. Therefore, we conclude that Lauderhill prevails, in each of the three instances in question, upon the instant record.

We could stop at this point. However, the Banks have raised certain arguments as to each of the three scenarios which merit some discussion.

■ With respect to the June, 1991, payment from Lindo's/Scamp, the Banks argue, firstly, that there was no express statement from Lindo's/Scamp to the Debtor that the payment should be allocated to Scamp. This circumstance is contrasted with the second payment from Lindo's/Scamp, when the latter forwarded a copy of a letter to the Debtor expressly stating that the payment should be allocated to Scamp's account. We conclude however, that the Banks' argument is rebutted by the following passage in the Restatement, *supra*, § 258, cmt. b & illus. 6, at 299, 300:

> b. *Direction.* The obligor must manifest his direction to the obligee, but he need not manifest it in words. A direction may be inferred from other circumstances, including the performance itself. It is often clear from the nature of the performance that it is to be applied to a particular duty, as is the case if goods delivered by a seller conform to only one of several contracts with the buyer. . . .
>
> .     .     .     .     .
>
> 6. A owes B two matured debts, one of $1,221, which will soon be barred by a statute of limitations, and the other of $1,193, which will not soon be barred. A pays B $1,183 with no further direction of its application. In the absence of a contrary indication, the coincidence of the amount of the payment and that of one of the debts sufficiently manifest A's intention that the payment be applied to

the $1,193 debt. The $1,193 debt is discharged.

The June, 1991, check remitted to the Debtor by Lindo's/Scamp was in the precise amount of the Scamp invoice enclosed with it. The direction to apply this payment to the Scamp debt, as opposed to the prior Lindo's debt, can therefore be readily logically inferred from the obligor's performance.

Secondly, the Banks argue that the Debtor's lack of a contract with Scamp, its later discovery of same, and its subsequent "correction" of its "error" in crediting the payment to Scamp nullifies both its earlier acquiescence in its own initial allocation of this payment to Scamp, and the right of Lindo's/Scamp's to allocate this payment.

■ The Debtor's alleged nullification of its internal error in crediting this payment to Scamp's account is immaterial. Having accepted the Lindo's/Scamp payment without returning it, the Debtor was bound to accept the allocation made by Lindo's/Scamp regarding it. The Debtor's internal allocation of the payment to the Lindo's account, even if communicated to Lindo's/Scamp, was ineffectual and hence of no significance. *See, e.g., Felin v. First Mortgage Guarantee & Trust Co.,* 248 Pa. 195, 198–99, 93 A. 956, 957 (1915); *Washington Natural Gas, supra,* 123 Pa. at 593, 16 A. at 801–02; *Martin v. Draher,* 5 WATTS 544, 545 (Pa.1836); *Christman v. Martin,* 7 Pa.Super. 568, 573 (1898); and Restatement, *supra,* § 258, cmt. a & illus. 2, at 298–99.[1]

■ The right of Lindo's/Scamp to make the allocation of its payment brings into focus a distinction between the instant facts and the facts of several of the cases cited in support of their position by the Banks. The Banks rely on the proposition that the obligor cannot direct an application of a payment in breach of the express terms relative to allocation of payments appearing in the parties' contract. *See In re Grigsby,* 127 B.R. 759, 765–66 (E.D.Pa.

---

1. To the extent that this court suggested to the contrary in *Penn Jersey, supra,* 72 B.R. at 983–84, we were in error. Unless the payment is returned to the obligor by the obligee, the obligor's allocation controls.

1991); and Restatement, *supra,* cmt. a, at 298.

However, here, there are no contracts which provide how allocations of payments are to be made. The Banks are therefore forced to argue that the parties' "custom" of allocating payments to the oldest or earliest outstanding indebtedness should control.

■ This argument fails because resort to "custom," or other equitable means of allocating payments, is applied only in circumstances where neither the obligor, in the first instance, nor the obligee, in the second instance, has made any legally-cognizable direction as to allocation. The absence of an express allocation, by either party, is what brought into play the reasoning and results in, *e.g., Pristas, supra,* 742 F.2d at 801–02; *Comer, supra,* 716 F.2d at 175–77; and *Page, supra,* 150 Pa.Super. at 433–36, 28 A.2d at 709–10.[2]

■ However, this rule applies only in cases where neither party has made an allocation. Here, we find that Lindo's/Scamp *made* an allocation of the June, 1991, payment to the post-petition June, 1991, indebtedness of Scamp to the Debtor. We further find that the Debtor had no right to reallocate the payment, since it declined to return it, and clearly had no right to unilaterally rescind its initial, express acquiescence in the allocation made by Lindo's/Scamp.

■ The contest concerning the July, 1991, payment from Lindo's/Scamp is even easier to resolve. The direction of Lindo's/Scamp that the Debtor allocate this payment to the Scamp indebtedness is clearer than the inferential direction in the case of the June payment. Again, the Debtor's acceptance of the payment without returning it forecloses any argument that its internal allocation to the contrary

bears any significance. There being an express allocation by the obligor, the rules applicable in the event of the parties' abdication in making an allocation never come into play. Like the June, 1991, payment, the July, 1991, payment must therefore be applied to Scamp's post-petition indebtedness, as Lauderhill urges.

■ The proper allocation of the USA payment is also clear on this record. The Trustee directed that his payments on behalf of USA be applied to USA's post-petition, June, 1991, obligations to the Debtor. The Debtor accepted the payments without even so much as a protest, and credited them as directed by the Trustee.

■ The only difficult and novel issue arises in light of Anthony's proffered Affidavit, pursuant to which USA and the Debtor allegedly mutually agreed to change the earlier allocation of USA's payments to whatever obligations the Debtor wished. We have no difficulty with the result in favor of Lauderhill on this record because the Affidavit is quite clearly not a part of this record. *See Torrington Co. v. Local Union 590, Int'l Union, United Auto., etc., Workers,* 803 F.2d 927, 932 (7th Cir.1986); *Feather v. United Mine Workers of America,* 494 F.Supp. 701, 713 (W.D.Pa.1980), *aff'd in part and rev'd & vacated in part on other grounds,* 711 F.2d 530 (3d Cir.1983); and *In re Mirkin,* 100 B.R. 221, 226 n. 4 (Bankr.E.D.Pa.1989).

The Banks could have, but have not to date, moved to reopen the record of this case to attempt to admit the Anthony Affidavit into the record as additional evidence. However, as we noted in *In re Pinto,* 89 B.R. 486, 502 (Bankr.E.D.Pa.1988), *modified,* 98 B.R. 200 (Bankr.E.D.Pa.), *rev'd,* C.A. No. 89–3233, 1989 WL 234516 (E.D.Pa. Aug. 18, 1989), citing 6A J. MOORE, ¶ 591.-04[13], at 59–36 to 59–37 (2d ed. 1988),

---

2. In *Page,* 150 Pa.Super. at 432–33, 28 A.2d at 709. the court questioned the continued vitality of Judge Gibson's statement in *Harker, supra,* that "the law presumes, in ordinary cases, that the debtor *intended* to pay in the way at the time was most to his advantage." 5 SERG. & RAWLE at 305. The Restatement, § 260(2), at 306, also, declines to follow the rule set forth in

*Harker* in the absence of allocation by either party, and provides for a "first in, first out" allocation formula. *See also Comer, supra,* 716 F.2d at 175 (holding that, in the event of failure of either party to make an allocation, the law presumes an allocation most favorable to the *creditor* ).

such motions are viewed with disfavor if they are not made until after a court has rendered a decision.[3] We note that parties can agree mutually to change the application of payments. *See* Restatement, *supra,* § 259, cmt. e, at 305. However, it is not clear from the Affidavit or any other matter of record that the Debtor would choose to do so.[4] Therefore, even if we accepted the contents of the Affidavit as a part of the record, it is doubtful that the result would change.

### E.  CONCLUSION

An Order directing that each of the disputed payments should be applied to Lauderhill's right to recover 75.8% of the Debtor's post-petition collections of accounts receivable will therefore be entered.

---

**3.** The degree of disfavor is exemplified by the district court's reversal of our reopening of the *Pinto* record, and its direction that we reinstate our original decision in favor of the defendants, even though, in light of the additional evidence presented, we had ultimately rendered a decision in favor of the plaintiffs. *But see Brown v. Wright,* 588 F.2d 708, 709–10 (9th Cir.1978); and *Rochez Bros. v. Rhoades,* 527 F.2d 891, 894–95 &

n. 6 (3d Cir.1975), *cert. denied,* 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976).

**4.** Since the Debtor may be able to retain 24.2% of the post-petition payments, it would not necessarily be prudent for it to attempt to change the original allocation of the USA payments.