**In re LEASE–A–FLEET, INC., Debtor.**

**Civ. A. Nos. 91–07716, 91–07718 and 91–07719.**
**Bankruptcy No. 91–12996S.**

United States District Court,
E.D. Pennsylvania.

April 14, 1992.

Jonathan H. Ganz, Rawle & Henderson, Philadelphia, Pa., for Lease–A–Fleet, Inc.

Karen Lee Turner, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., for Morse Operations, Inc. d/b/a Lauderhill Leasing.

Domenic E. Pacitti, Lesser & Kaplan, P.C., Blue Bell, Pa., Jo Ann Jawidzik, Patterson & Weir, Philadelphia, Pa., for Meridian Bank.

David E. Fraimow, Fox, Rothschild, O'Brien & Frankel, Jo Ann Jawidzik, Patterson & Weir, Philadelphia, Pa., for United Valley Bank.

Frederic J. Baker, Asst. U.S. Trustee, pro se.

## MEMORANDUM

ROBERT F. KELLY, District Judge.

Lease–A–Fleet, Inc. ("LAF" or "Debtor") filed for protection under Chapter 11 of the Bankruptcy Code. Presently before the court are three appeals of various Orders issued by the bankruptcy court which are all related and therefore addressed collectively in this opinion. Appellant Morse Operations, Inc. d/b/a Lauderhill Leasing ("Morse") appeals the following two rulings: (1) by Order dated September 5, 1991, the court ruled that under an Order it had previously issued, dated July 15, 1991, Morse was not entitled to 75.8% of certain payments made by Miami Rent–A–Car, Inc. ("Miami") and Glenn Auto Rental, Inc. ("Glenn"); and (2) by Order dated November 7, 1991, the court ruled that Morse could not collect pre-judgment interest on its recovery of certain sums. Appellees

United Valley Bank and Meridian Bank ("Banks") argue that the above rulings should be affirmed. The Banks also appeal a ruling of the bankruptcy court, claiming that by Order dated September 26, 1991, the court wrongly allocated certain payments received by LAF to post-petition accounts. 131 B.R. 945. This court sits as an appellate court and has plenary review of a bankruptcy judge's conclusions of law. Findings of fact may not be set aside unless clearly erroneous. *See Century Glove, Inc. v. First American Bank of New York*, 860 F.2d 94, 99 (3d Cir.1988).

## I. *September 5 Order Denying Recovery of Payments*

▉ Before LAF filed for bankruptcy, Morse entered into several leasing agreements with LAF for automobiles, and LAF then subleased certain of the automobiles to Miami and Glenn. Falling behind in its payments to Morse, LAF filed for bankruptcy protection on May 30, 1991. On May 31, 1991, Morse filed a motion seeking relief from the automatic stay and possession of the cars. During a hearing, Morse and LAF entered into an interim settlement, the terms of which are not in dispute here.

A July 15, 1991 hearing was subsequently held to decide Morse's motion for relief from the stay. During this hearing, LAF and Morse submitted a proposed consent order to the court. This proposed order sought to give Morse adequate protection for LAF's continued use of the cars. The Banks, as secured creditors, objected to certain portions of the proposed order's contents. The parties managed to reach agreements which satisfied some of the Banks' objections, but full agreement could not be reached. *See* Transcript of July 15, 1991 Hearing at pp. 79–81. The bankruptcy court therefore heard evidence and issued its July 15 Order. This document is the proposed consent order submitted by the parties. The court drew a line through the word "Consent," apparently because the Banks, as interested parties, never consented. The Order also contains certain additions and deletions which reflect the limited agreements reached by all the par-

ties, and some changes made by the court itself.

The July 15 Order provides that Morse is to receive adequate protection from the stay in the form of 75.8% of all payments on post-petition receivables collected by LAF. If LAF fails to turn over this percentage, or fails to meet other obligations, Morse will immediately receive relief from the stay to pursue possession of the vehicles. Relevant portions of the July 15 Order provide as follows:

[¶ 2] Debtor will immediately pay over to [Morse] the portions of all amounts received as payment for post petition rentals up to an amount representing depreciation and interest on vehicles subleased by the Debtor for which such payments were received.

\* \* \* \* \* \*

[¶ 5] The Debtor shall pay, as adequate protection ... to [Morse], the amount representing depreciation and interest on all vehicles leased by it to [sublessees including Miami and Glenn] ... If Debtor fails to make any such payment when due, [Morse] is immediately granted relief from stay to pursue all remedies for possession of vehicles leased to the Debtor and subleased to the defaulting sublessee.

\* \* \* \* \* \*

[¶ 6] ... if debtor fails to comply with the provisions of this paragraph, [Morse] is granted relief from stay to pursue all remedies for possession of vehicles leased to the debtor and subleased to any such sublessee who is not in compliance....

The parties agree that "the amount representing depreciation and interest" is equal to 75.8% of a given rental payment. The July 15 Order also required LAF to cure certain insurance deficiencies by July 18, 1991, but LAF failed to meet this requirement. Morse automatically received relief from the stay on July 18, 1991 to obtain possession of the vehicles. On August 1, 1991, LAF made a payment to Morse equal to 75.8% of certain post-petition receivables, but subsequently failed to turn over

75.8% of the Miami and Glenn payments. There were two payments from Miami of $40,829.49 received on July 12, 1991 and July 19, 1991, and one payment from Glenn of $9,220.00 received on July 2, 1991 (the "Disputed Payments"). According to counsel, both of the Miami payments were for use of the cars during July, and the Glenn payment was for use of the cars during June.

Morse sought to compel LAF to turn over 75.8% of the Disputed Payments. After a hearing, the bankruptcy court issued its September 5 Order denying Morse's claim. The Court stated its reasoning as follows:

> "Upon carefully reading the [July 15] Order as a whole, it is apparent that paragraph 2 ... refers only to 'paying over' sums received as of the date of the Order. Paragraph 5 provides that relief from the stay is the sole remedy provided to Morse for the Debtor's failure to abide by the Order."

September 5 Order. The July 15 Order does not state that relief from the stay is Morse's *sole* remedy. Subsequently, the court issued an Order dated November 7, 1991 denying Morse's motion to reconsider, stating as follows:

> We read paragraph 2 as providing relief only until and in the event relief from the stay, pursuant to paragraphs 5 and 6, was granted to [Morse]. This result is supported by the principle that relief from the automatic stay normally eliminates bankruptcy court jurisdiction, *see In re Anderson,* 129 B.R. 44, 48–49 (Bankr.E.D.Pa.1991), but we reach our conclusion by simply a close reading of an ambiguous document.

November 7 Order.[1] Reading these two Orders in conjunction, it is clear that the court interpreted the July 15 Order such that relief from the stay terminated LAF's obligation to turn over 75.8% of the Miami and Glenn payments, and Morse's only remedy was to pursue possession of the vehicles.

Morse claims that the July 15 Order clearly requires LAF to turn over the Disputed Payments even though relief from the stay had been granted. The Order is ambiguous and I therefore disagree. In every instance where the consequences of LAF's failure to abide by the Order is mentioned, the Order simply states that Morse is given relief from the stay to pursue possession of the vehicles, nothing more. Morse also contends that the July 15 Order is a consent order which embodies an agreement between it and LAF, and is therefore a contract which must be interpreted under general contract principles. I do not agree that this Order is a contract because the court below heard evidence and made judicial terminations regarding the Banks' objections. However, the court did adopt the Order's language which is now in dispute, so it is clear that the court approved the arrangement *as proposed* by LAF and Morse. The court's statement that "[a]ll parties ultimately agreed to the form of [the July 15] Order" supports this conclusion. September 26, 1991 Opinion at 3. Accordingly, although not controlling, the parties' intent may offer some insight and is therefore a proper consideration. Further, I believe that the purpose of the July 15 Order should be the primary focus of any interpretation.

The Banks contend that the sole purpose of adequate protection and hence the July 15 Order is to compensate Morse for denial of its right to pursue possession. Thus, Morse should not receive compensation once the stay was lifted even though LAF used the cars. Otherwise, the Banks warn, a debtor would be at the mercy of a creditor who could choose between pursuing possession or collecting payments, and a bankruptcy court would lose all control. None of these concerns are applicable to the facts of this case. Further, the concept of adequate protection and, more importantly, the purpose of the July 15 Order, is clearly broader than the Banks suggest. Adequate protection is supposed to insure

---

**1.** The court's reference to the elimination of jurisdiction is expressly not a basis for its decision. Moreover, there is jurisdiction over these

rental proceeds. *See* Appellant's Brief at 21–25 (cases cited therein).

that Morse's position does not deteriorate by virtue of LAF's use of Morse's property. The Disputed Payments were received by LAF because, as a result of the stay, it was able to use Morse's property. Compensating Morse would be entirely consistent with the purpose of the July 15 Order. This result is supported by the parties' intent, as evidenced by their conduct. LAF actually turned over a payment on August 1, 1991, after the stay was lifted. Accordingly, I find that Morse is clearly entitled to the Disputed Payments under the July 15 Order and therefore reverse.

## II. *November 7 Order Denying Pre-Judgment Interest*

■ Morse claims that the July 15 Order is a consent order and therefore a contract which was breached when LAF failed to turn over the Disputed Payments. Morse sought pre-judgment interest under Pennsylvania contract law. The bankruptcy court found that "[p]re-judgment interest appears inappropriate because the rights of [Morse] were indefinite until we entered our Order." November 7, 1991 Order (citing *In re Repco Products Corp.*, 100 B.R. 184, 202–03 (Bankr.E.D.Pa.), *aff'd*, C.A. No. 89–5514 (Sept. 8, 1989). Apparently, the court never decided the contract issue.

As explained in Part I of this opinion, the July 15 Order is not a contract. The court heard evidence in order to make judicial determinations regarding the Banks' objections, and it is therefore a judicial decree. Under Pennsylvania law, the award of pre-judgment interest is therefore a matter of discretion and a court is to apply equitable factors. *See* Briefs (cases cited therein). The controversy surrounding the July 15 Order was in large part due to the ambiguous language of the consent order proposed by Morse. Morse directly contributed to the delay of its recovery of the funds for which it now seeks pre-judgment interest, and I therefore affirm.

**2.** The cars leased to Lindo could not be repossessed by LAF in the event of non-payment because they had been leased too recently to permit this remedy. Scamp and Lindo have a

## III. *September 26 Order Allocating Payments to Morse*

■ LAF also subleased certain automobiles to Lindo's Rent–A–Car, Inc. ("Lindo") and USA Rent–A–Car/Florida, Inc. ("USA"). In March 1991, Lindo sold its business to Scamp Auto Rental I, Inc. d/b/a Dollar Rent A Car ("Scamp" or "Dollar") as an accommodation to LAF.[2] Scamp acquired control and use of the cars previously leased to Lindo. LAF erroneously assumed that Scamp had assumed Lindo's debts, but still treated Scamp in all respects as a new customer. LAF and Scamp never executed any type of agreement. In May 1991, LAF filed for Chapter 11.

On September 4, 1991, the bankruptcy court held a hearing pursuant to the Banks' motion for relief from the automatic stay. The court approved a stipulation executed by LAF, Morse and the Banks providing that the Banks were entitled to collect pre-petition rental payments made to LAF. Under the July 15 Order, Morse was entitled to 75.8% of all post-petition payments. Naturally, the Banks and Morse could not agree on the allocation of certain payments as post or pre-petition. The following payments are in dispute: (1) a $234,111.70 check, dated June 6, 1991, from Scamp to Lindo which Lindo endorsed and sent to LAF (the "June Scamp Payment"); (2) a $174,365.03 check, dated July 30, 1991, from Lindo to LAF (the "July Scamp Payment"); and (3) four checks totaling $144,785.99 all dated in July 1991, from USA to LAF (the "USA Payments").

After a hearing and briefing, the bankruptcy court issued a September 26, 1991 ruling that these payments were post-petition. The court found that there was no contract as to allocation, and that USA and Lindo/Scamp each allocated the payments as post-petition. The Banks filed a motion for reconsideration, arguing that the court misapplied the facts.[3] By Order dated No-

common owner and, apparently, the sale to Scamp solved this dilemma.

**3.** The Banks also raised for the first time its contention that the July 15 Order limits Morse

vember 7, 1991, the Banks' motion was denied. For the reasons stated below, I affirm.

Under Pennsylvania law, payments are allocated according to the designation given by the account debtor. If the account debtor fails to exercise this right, then the account creditor's allocation controls. If it fails to allocate, then equitable principles are applied. *See In re Comer,* 716 F.2d 168, 175 (3d Cir.1983). While an express allocation controls, an established course of conduct can also establish a particular allocation. *Id.* "It is often clear in the nature of the performance that it is to be applied to a particular duty ..." Restatement (Second) of Contracts, § 258 comment b, illustration 6 (1981). Allocation of payment to a particular debt may also be inferred from the circumstances. *See Felin v. First Mortg. Guarantee & Trust Co.,* 248 Pa. 195, 93 A. 956 (1915).

Regarding the USA Payments, each of the four payments was accompanied by a cover letter from the USA Trustee. The bankruptcy court's finding that these letters represented an express allocation to post-petition by USA is fully supported by the record, and is not clearly erroneous. Conversely, the oral agreement alleged by the Banks is totally unsupported. The only evidence offered below was inadmissible and properly excluded by the bankruptcy court.

Regarding the June and July Scamp Payments, the facts are mostly undisputed. LAF initially treated Scamp as a separate customer with its own account, and billed Scamp directly for June and July.[4] In response to the June invoice, Scamp issued a check to Lindo for less than the amount of the invoice, the difference being a credit Scamp should have received for cars it had returned prior to June. This credit was not reflected on the June invoice. Scamp prepared a document explaining the basis of these credits and sent it along with its check to Lindo. Lindo endorsed the check over to LAF, and sent both the check and Scamp's accounting of the credits to LAF. LAF deposited the check into Scamp's post-petition account and sent Scamp a statement of account crediting Scamp for the payment.

In response to the July invoice, Scamp issued a check to Lindo with a cover letter instructing Lindo to make payment to LAF for the July invoice. Lindo issued its own check to LAF with the inscription "July Payment for Dollar." Scamp does business under the name Dollar. LAF subsequently learned that it did not have a written lease with Scamp. LAF therefore allocated both the June and July Scamp Payments to Lindo's oldest open invoice, which is pre-petition.

The court below treated Scamp and Lindo as more or less the same entity, referring to them as "Lindo/Scamp." Thus, according to the court below, the account debtor is Lindo/Scamp. In regard to the June Scamp Payment, the court found that by submitting an amount exactly equal to the June invoice, it is only logical to infer a direction by Lindo/Scamp to apply this payment to Scamp's post-petition debt. Having accepted this payment, LAF was bound to accept the allocation because under the law, LAF was required to either return the payment or allocate it as designated by Lindo/Scamp. *See* September 26, 1991 opinion at 11 (citations therein). In regard to the July Scamp Payment, the court below found that the Dollar inscription was an express allocation by Lindo/Scamp. *Id.* at 13.

The Banks claim that (1) Scamp was not an account debtor and could not allocate; (2) Lindo was the account debtor and did not designate an allocation; and (3) either LAF's final allocation or equity principles control, and both lead to a pre-petition allocation. Although it was perhaps inaccurate for the court to refer to "Lin-

---

to either payment or relief from the stay. The court properly refused to consider this argument. *See* Appellee's Brief at 15–19. Although it is not considered here, this same argument was properly raised in another appeal and was completely rejected. *See* Part I of this Opinion.

**4.** While the Banks claim that Scamp was not billed directly, the invoices are addressed to Scamp.

do/Scamp," the court's analysis is totally sound. The parties' performance clearly manifested to LAF Lindo's intention to allocate these payments post-petition. Looking at both the June and July payments together, and the way in which Lindo forwarded them pursuant to Scamp's directions, it is clear that Lindo was intentionally following the allocation designated by Scamp. Further, LAF obviously knew this. The amount of the June Payment was exactly equal to the amount billed Scamp minus the credits claimed by Scamp. The June Payment forwarded by Lindo to LAF was accompanied by a document prepared by Scamp explaining the basis for these credits. LAF originally credited Scamp's account for the June Payment and sent Scamp a statement to that effect. Lindo's inscription on the July Payment expressly allocated it towards Scamp's account. The court's finding that the account debtor expressly allocated these payments post-petition is not clearly erroneous and I therefore affirm.

I shall therefore issue the following Order.

### ORDER

AND NOW, this 13th day of April, 1992, it is hereby ORDERED as follows:

1. Upon consideration of the Appeal of Morse Operations, Inc. from the Bankruptcy Court's Orders dated September 5, 1991 and November 7, 1991 denying recovery by Morse of 75.8% of the Miami and Glenn payments, I REVERSE.

2. Upon consideration of the Appeal of Morse Operations, Inc. from the Bankruptcy Court's Order dated November 7, 1991 denying recovery of pre-judgment interest, I AFFIRM.

3. Upon consideration of the Appeal of United Valley Bank and Meridian Bank from the Bankruptcy Court's Order dated September 26, 1991 classifying certain payments as post-petition and declaring Morse Operation, Inc.'s entitlement to a percentage of said payments, I AFFIRM.