**In re LEASE–A–FLEET, INC., Debtor.**

**LEASE–A–FLEET, INC., Plaintiff,**

**v.**

**MORSE OPERATIONS, INC. d/b/a Lauderhill Leasing, Defendant.**

**Bankruptcy No. 91–12996S.**
**Adv. No. 92–0172S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

June 9, 1992.

Patrick Stapleton, Rawle & Henderson, Michael R. Needle, Philadelphia, Pa., for debtor.

Robert C. Sayre, Patterson & Weir, The Land Title Bldg., Philadelphia, Pa., for Banks.

Karen Lee Turner, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., for Lauderhill.

Frederic Baker, Philadelphia, Pa., Asst. U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant proceeding is a rather singular action to recover alleged preferential payments made by LEASE–A–FLEET, INC. ("the Debtor"), an intermediate lessor-lessee of motor vehicles, to MORSE OPERATIONS, INC. doing business as LAUDERHILL LEASING ("Lauderhill"), the lessor of vehicles to the Debtor. The Debtor seeks to recover at least a portion of over $5.25 million paid by the Debtor to Lauderhill in the applicable 90–day period prior to the Debtor's bankruptcy filing. The principle issues presented are (1) whether the Debtor has met its burden of proving the elements of 11 U.S.C. §§ 547(b)(3) and (b)(5), *i.e.*, its insolvency and that Lauderhill received more than it would receive in a Chapter 7 case, respectively; (2) whether the Debtor made an assignment of payments from one of its sub-lessees, Lindo's Rent–A–Car, Inc. ("Lindo"), to Lauderhill, and hence whether these payments were transfers of interests of the Debtor; and (3) whether draws of $1 million by Lauderhill on a letter of credit must be discounted in the computation of whether Lauderhill provided uncompensated "new value" to the Debtor after each of the payments in issue pursuant to 11 U.S.C. § 547(c)(4).

We conclude that (1) the Debtor has proven the elements of 11 U.S.C. §§ 547(a)(3) and (b)(5); (2) no final and complete assignments of Lindo's payments to Lauderhill were made; and (3) the draws on the letter of credit must be counted as payments to Lauderhill on account of new value provided by it to the Debtor in § 547(c)(4) analysis. Therefore, all of the payments of the Debtor to Lauderhill in the preference period are potentially avoidable. We assume that the Debtor would choose to recover on its largest potential claim under § 547(b), a recovery of $850,055.03 on account of its payment of $1,164,054.43 to Lauderhill on April 26, 1992, and we therefore will enter a judgment in favor of the Debtor in that amount. Finally, we also hold that, in light of this judgment, Lauderhill's motion to temporarily allow its claim for voting purposes must be denied.

### B. PROCEDURAL AND FACTUAL HISTORY

Litigation between Lauderhill and the Debtor, occasionally joined by the Debtor's two secured creditors, Meridian Bank ("Meridian") and United Valley Bank ("UVB") (collectively Meridian and UVB are referenced as "the Banks"), has engulfed this voluntary Chapter 11 bankruptcy case since its inception on May 30, 1991. The parties have displayed little inclination to resolve many issues of consequence arising during its one-year lifespan. The result of this over-litigiousness has necessitated two

published Opinions of this court and one of the district court, *In re Lease–A–Fleet, Inc.*, 140 B.R. 840 (Bankr.E.D.Pa.1992) ("*LAF III*") (guidelines for determinations of Lauderhill's administrative claims set forth); and *In re Lease–A–Fleet, Inc.*, 131 B.R. 945 (Bankr.E.D.Pa.1991) ("*LAF I*"), *rev'd in part & aff'd in part*, 141 B.R. 63 (E.D.Pa.1992) ("*LAF II*"), *appeal pending* (determination of rights of Lauderhill and secured banks to various payments received by the Debtor post-petition). Remaining before the courts, in addition to the appeal of *LAF II* by the Banks, is the possibility of a substantial jury trial in the district court in a case of charges and counter-charges of the Debtor and Lauderhill as to one another's pre-petition conduct; and, in this court, a determination of which, if any, of competing plans of liquidation submitted by the Debtor and by Lauderhill may be confirmed.

The expanding history of this case, set forth by us up to May 7, 1992, in *LAF III*, op. at 841–44; and in *LAF I*, 131 B.R. at 947–48, will not be repeated. We update this recitation by noting that the trial of the district court litigation between Lauderhill and the Debtor has been put off to July, 1992, while that court wrestles with cross-motions for summary judgment in the case before it. On May 20, 1992, the scheduled date of, *inter alia*, confirmation hearings on both outstanding plans, plus objections of Lauderhill to the claims of Meridian and Robins–LeCocq Corp. ("Robins"), a corporation owned by the family of the Debtor's principals, the parties requested a continuance of all of those matters until after the district court trial in July, 1992. This court declined, believing that focusing the parties upon confirmation might lead to negotiation and perhaps resolution of some of the issues. These matters were therefore continued only until June 10, 1992, the scheduled trial date of another choice piece of litigation arising out of this case, an adversary proceeding brought by Lauderhill against Robins to "substantively consolidate" Robins, a non-debtor, with the Debtor.

In *LAF III*, at 844, we pointed out that the disposition of this proceeding was in-strumental to the plan-confirmation process, because Lauderhill had filed a motion to have a claim in the amount of at least $3 million temporarily allowed for voting purposes. The Debtor had defended this motion by attacking the right of Lauderhill to assert a claim and vote on any plan, on the basis of 11 U.S.C. § 502(d), because of Lauderhill's potential liability to the Debtor under 11 U.S.C. § 547 in this proceeding. In our accompanying Order, in light of our entry of judgment on its § 547 claim against Lauderhill and in favor of the Debtor, we sustain the Debtor's § 502(d) defense, and deny Lauderhill's motion that its claim be temporarily allowed.

As *LAF III*, at *id.*, also indicates, this proceeding was tried on two full days, April 27, 1992, and May 4, 1992. Post-trial Briefs were filed on May 15, 1992, supplementing submissions pro and con on Lauderhill's pre-trial motion for summary judgment, which we effectively denied by conducting the trial.

During the trial, the Debtor called its controller, Gerald Monagle; its president, Steven Wolk ("Steven") (other witnesses will be referred to by their surnames unless otherwise indicated); its former president and Steven's father, Donald Wolk ("Donald"); and its counsel and Steven's brother-in-law, David Mallenbaum, Esquire. Lauderhill called employees of the Banks (briefly); Kenneth Biddick, an expert accountant; its chief financial officer, Donald A. MacInnes; and its controller, Leonidas Roussos. The following largely undisputed facts were adduced through this testimony.

Steven bought the Debtor in January, 1990, from his father and mother, Donald and Berle Wolk. As explained by Monagle, who provided most of the relevant narrative testimony, the Debtor's vehicle-lease payments to Lauderhill were originally billed, in advance, on the first day of each month. However, under the terms of a "Temporary Cash Assistance Program" of Lauderhill, under which the Debtor began operating in January, 1990, the Debtor was allowed to pay seventy-five (75%) percent of the monthly invoices by the 20th day of the relevant month and the remaining

twenty-five (25%) percent of the invoices by the 27th day of the relevant month.

In April, 1990, Lauderhill demanded that the Debtor provide it with a $1 million letter of credit as security for future payments. Although Donald testified that Lauderhill withdrew and then later reiterated this request, MacInnes claimed that Lauderhill was simply patient on allowing this request to be fulfilled until November, 1990, when it became insistent. Donald then obtained the letter of credit from his bank, Meridian, issued to "Donald Wolk d/b/a Lease–A–Fleet, Inc.," but secured by the Debtor's accounts receivable.

In early 1991, due to the influx of the Persian Gulf War and a burgeoning economic recession, some of the Debtor's customers, all of whom were small vehicle rental agencies in Florida, became financially distressed and were unable to pay the Debtor. Lauderhill's January, 1991, bill was received late in the month by the Debtor, and it was unable to bill many of its customers for January. As a result of the economic crunch and the late billing, the Debtor's January bill to Lauderhill went unpaid.

On February 22, 1991, Steven sent MacInnes a lengthy letter, complaining about the late billing and explaining that payments for January, 1991, would be forthcoming in the form of a direct payment of $755,530 and receipt of $572,420 out of the Debtor's entitlement to recover $988,000 from Lindo out of the proceeds of a final settlement in connection with the sale of Lindo's business, scheduled on March 12, 1991, as an offer to settle the parties' differences. Lauderhill was invited to the settlement "to facilitate a direct payment." Monagle claimed that this was the only time in the parties' history that the Debtor had not made a full monthly payment within 30 days after the due date.

Acting upon the offer in this letter, the Debtor sent a $755,830 payment check to Lauderhill on February 27, 1991. Although MacInnes wrote to Steven on that same day, indicating that he believed that the balance due to Lauderhill was still in excess of $3 million, he also stated that the payment would be accepted in partial payment. On March 1, 1991, Lauderhill cashed this check. This payment was the first of eleven [1] alleged preferential payments in issue in this proceeding.

On March 6, 1992, Steven wrote to Lindo and advised it to make payment of a check, then understood to be forthcoming in the amount of $912,200.32, directly to Lauderhill. The letter stated that the Debtor "reserve[d] the right to modify or revoke this direction at any time prior to the issuance and delivery of the check, ... "

On March 12, 1991, Richard Tashjian, Lauderhill's Director of Operations, wrote to Steven, reminding that this was Lindo's proposed settlement date and advising that Lauderhill had credited the Debtor for a payment of $105,000 due to the Debtor for credits on 500 Chevrolet Caprice automobiles subleased to Lindo. The Debtor did not protest Lauderhill's seizure of these funds; this $105,000 payment is now alleged to be the second preferential transfer of the Debtor to Lauderhill.

On March 18, 1991, MacInnes wrote to Steven in response to his letter of February 22, 1991. MacInnes disputed many of the assertions in Steven's letter, and does not appear to have accepted Steven's offers for a resolution of the controversy stated therein.

On April 15, 1991, Lindo sent $607,021.49 to Lauderhill. The discrepancy between the anticipated amount and that actually sent was not explained by Lindo. Without advising the Debtor of his intention to do so, Lindo also sent its March, 1991, rental payment due to the Debtor, in the amount of $142,241.05, directly to Lauderhill. These payments represent the third and fourth allegedly preferential transfers.

Apparently disappointed by the shortage in the amounts received from Lindo, Lauderhill sent a letter of March 20, 1991, to the

---

**1.** At trial, the Debtor withdrew its original claim that a $8,053.05 payment of March 6, 1991, to Lauderhill was preferential.

Debtor, declaring a default under the parties' lease agreement, and threatened to draw on the letter of credit and begin suit unless $2,333,690.59 were paid to it within 24 hours. Monagle testified that this communique was, up to that date, easily the low-water mark in a relationship which had been mutually cordial until February, 1991.

The parties met and negotiated a settlement thereafter, which was confirmed in a letter of April 1, 1991. Therein, the Debtor promised to "immediately" wire $1,220,802.00 to Lauderhill, which it did in payments of $600,000 and $620,802, which are presently designated as the fifth and sixth allegedly preferential transfers. The Debtor was also to "exert its best efforts" to cause Lindo to pay over to Lauderhill the alleged $291,257.26 balance owed by Lindo to the Debtor, and, if this sum were not paid, it was stated that the Debtor "will assign the payment" to Lauderhill. The Debtor was also to issue a promissory note in favor of Lauderhill in the amount of $1.5 million, which would bring the stated balance of $3,369,435.63 down to $71,376.39.

On April 15, 1991, the Debtor endorsed a check in the amount of $82,500, received as an incentive on a lease of 300 Pontiac Firebirds which had been subleased to Lindo, to Lauderhill. This represents the seventh allegedly preferential transfer.

On April 26, 1991, the Debtor wired $1,164,054.43 to Lauderhill to replace a check in payment of the April rental bill on which payment had been stopped by the Debtor, allegedly because a customer of the Debtor had given it a bad check. This is the eighth and, as it developed, *see* pages 867–869 *infra,* most significant of the alleged preferential transfers.

On May 7, 1991, and May 14, 1991, apparently not having received the $1.5 million promissory note, Lauderhill sent additional notices of default to the Debtor, threatening to again draw on the letter of credit and again demanding return of all vehicles leased to the Debtor. The May 14, 1991, letter recited a balance due of $2,613,879.77, noting that Lauderhill had recently received $192,300 on account of a "fast start" credit payable to the Debtor. The

receipt of this payment, of which Monagle testified that he was unaware until he received this letter, was the putative ninth preferential transfer.

On May 24, 1991, Lauderhill wrote letters to all of the Debtor's customers, requesting that they return to Lauderhill their vehicles subleased from the Debtor. Finally, on May 28, 1991, and May 30, 1991, Lauderhill received, pursuant to its demands, $600,000 and $400,000, respectively, from Meridian in payment on the letter of credit. At the time of the last draw, the Debtor had an account balance of $56,000 with Meridian, resulting in a $944,000 charge to its account. The draws on the letter of credit are the tenth and eleventh and final alleged preferential transfers. The Debtor filed its bankruptcy petition later in the day of May 30, 1991.

Monagle testified briefly regarding the Debtor's solvency. The Debtor's Schedules listed debts of $6,027,141 and assets of $8,841,793. However, $8,824,334 of the Debtor's reported assets were accounts receivable. Monagle testified that not only were accounts receivable listed on the Schedules at their face value, without regard to collectability, but also sums not payable until June, 1991, an amount over $2 million, were listed. Monagle's unrebutted analysis was that accounts receivable of the Debtor of only $3,447,330 existed as of February 28, 1991, and that collectible receivables actually owed to the Debtor at the time of filing amounted to only $5 million. He also noted that proofs of claim totalling over $700,000 which had not been listed on the Schedules had been filed by creditors in the case.

Administrative claims were estimated at $300,000 for legal costs, without counting the amount of any administrative claims allowable to Lauderhill. In *LAF III,* 140 B.R. at 847–48, we estimated Lauderhill's potential administrative claim to be about $180,000 in addition to about $420,000 due to it as the result of the decision in *LAF II. But see* page 868 n. 3 *infra.*

Biddick presented a series of computations of the potential preferential amount of each of the payments, taking into ac-

count Lauderhill's provision of "new value" in the form of continued availability of leased vehicles to the Debtor. In his computations, hypothesizing provision of new value through, alternatively, May 24, 1991, and May 30, 1991, Biddick ultimately utilized per diem rates of $51,840 for March, 1991; $48,099 for April, 1991; and $42,193 for May, 1991. Presenting calculations of his own on rebuttal, Mallenbaum also used the foregoing per diem rates, although he also hypothesized May 7, 1991, as an alternative last day that new value was provided.

Very little other relevant evidence was adduced during the trial. Steven, Mallenbaum, and Monagle all denied even having explicitly written or stated that the Debtor's receipts from Lindo were "assigned" to Lauderhill. MacInnes, by way of weak rebuttal, testified that "Steven Wolk said that they had money coming from Lindo and that we could have that money."

## C. DISCUSSION

### 1. APPLICABLE STATUTORY PROVISIONS.

There is no question that, as a proceeding to recover preferences, this matter is a core proceeding, 28 U.S.C. § 157(b)(2)(F), which this court can and must hear and determine. 28 U.S.C. § 157(b)(1).

One of the stated goals of bankruptcy is to provide a fair and equitable distribution collectively among all creditors of a debtor. *See, e.g., Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 641 (3d Cir.1991); and *In re Kulzer Roofing, Inc.,* 22 B.C.D. 1339, 1342–43 (Bankr. E.D.Pa.1992). To insure equality of treatment among creditors, the Bankruptcy Code ("Code") provides that a trustee or debtor-in-possession, 11 U.S.C. § 1107(a), may avoid payments or preferential transfers made to creditors shortly before the filing of bankruptcy. These provisions are set forth in 11 U.S.C. § 547(b) as follows:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such a creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been paid; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The Debtor has requested that the eleven payments in issue made to Lauderhill and listed above be avoided pursuant to § 547(b). Resolution of the Debtor's request requires a two-step analysis. First, each payment must be reviewed individually and a determination made whether it fulfills all of the requirements set forth in § 547(b). The court may determine a payment voidable only if *every* requirement set forth in § 547(b) is met. Second, if a payment is deemed to be preference, then any defenses of Lauderhill articulated under 11 U.S.C. § 547(c) to the payment must be addressed. We find, *see* pages 863–864 *infra,* that the only pertinent provision of § 547(c) is 11 U.S.C. § 547(c)(4), which provides as follows:

(c) The trustee may not avoid under this section a transfer—

.     .     .     .     .

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did to make an otherwise un-

avoidable transfer to or for the benefit of such creditor; ...

2. **THE DEBTOR HAS MET ITS BURDEN OF PROVING THAT 11 U.S.C. §§ 547(b)(3) AND (b)(5) ARE SATISFIED.**

■ Pervading the Debtor's entire case is its need to prove that it was insolvent at the time of each of the transactions in issue, as required by 11 U.S.C. § 547(b)(3), and that Lauderhill received more, in the disputed transfer, than it would have received had the Debtor's estate been liquidated under Chapter 7 of the Bankruptcy Code, as required by 11 U.S.C. § 547(b)(5).

The meaning of "insolvency," as employed in the Code, is set forth in 11 U.S.C. § 101(32). It is a "financial condition such that the sum of such entity's debt is greater than all of such entity's property, at a fair market value...." The Code further provides that, in a § 547 action, the "debtor is presumed to have been insolvent on or during the ninety (90) days preceding the date of the filing of the petition." 11 U.S.C. § 547(f).

■ In *In re Old World Cone Co.*, 119 B.R. 473, 476–79 (Bankr.E.D.Pa.1990); and *In re Art Shirt Ltd., Inc.*, 68 B.R. 316, 322–23 (Bankr.E.D.Pa.1986), *aff'd*, 93 B.R. 333 (E.D.Pa.1988), this court addressed the issue of insolvency in relation to preference actions under § 547(b)(3). The bankruptcy test for insolvency is a balance sheet test; if the debtor's liabilities exceed its assets, then it is insolvent. *See Old World Cone, supra,* 119 B.R. at 478; and *Art Shirt, supra,* 68 B.R. at 322.

In the instant proceeding, the Debtor is presumed to have been insolvent on the date of each of the alleged preferential payments. 11 U.S.C. § 547(f). Lauderhill had the burden of rebutting this presumption. If it did so, the "bubble" of the presumption would "burst" and the burden of proof would again be relegated to the Debtor. *See Old World Cone,* 119 B.R. at 477–78. At trial, Lauderhill attempted to overcome the presumption by proffering (1) the Debtor's Schedules, which listed assets valued in excess of its liabilities; (2) evidence (ad nauseam) that the Debtor had made numerous "voidable" but not yet avoided payments from its insiders which, it recovered by the Debtor, would render it solvent; and (3) the Debtor's principals had opined that, if they succeeded spectacularly in the district court litigation against Lauderhill, the Debtor would be solvent.

The latter two arguments are so weak that we do not believe that they are capable of "bursting" any sort of "bubble." It is only if and when the debtor-in-possession *recovers* property under, *inter alia*, 11 U.S.C. §§ 550(a), 547(b), that property becomes property of the Debtor's estate. 11 U.S.C. §§ 541(a)(3), (a)(7). Lauderhill is not likely to agree that the Debtor is entitled to any claim against it in the district court action. Indeed, Lauderhill is making claims against the Debtor in that action which, if successful, would enhance the Debtor's insolvency. Insofar as claims against the insiders are concerned, Lauderhill would be obliged to exercise its potential right to be granted permission to pursue those parties, *see In re Martin*, 124 B.R. 69, 72 (N.D.Ill.1991); *In re Nicolet, Inc.*, 80 B.R. 733, 737–39 (Bankr.E.D.Pa. 1987); and *In re Morrison*, 69 B.R. 586, 589–90 (Bankr.E.D.Pa.1987), and succeed therein before any such claims could be considered as "assets." Lauderhill has not even asked for permission to pursue these parties to date.

■ Lauderhill approaches "bubble bursting" on more solid ground with its claim that the Debtor's Schedules, on their face, appear to indicate an excess of assets over liabilities at the time of the bankruptcy filing. The court is, however, not obliged to accept the declaration on the Schedules as conclusive evidence of solvency. *See In re Joshua Slocum, Ltd.*, 103 B.R. 610, 620–24 (Bankr.E.D.Pa.), *aff'd*, 121 B.R. 442 (E.D.Pa.1989); and *Art Shirt, supra*, 68 B.R. at 322–23. Monagle presented convincing and unrebutted evidence that (1) the Debtor's assets were overstated by $2 million due to their inclusion of June, postpetition billings and another $1.8 million by the valuation of receivables from the Debtor's financially unstable customers at their

face value; and (2) the Debtor's liabilities were understated by omission of $700,000 in liabilities. All of these adjustments appear appropriate. *Compare Joshua Slocum, supra,* 103 B.R. at 621–24.

Given these adjustments, the Debtor's assets at filing drop to slightly over $5 million, while its liabilities rise to about $6.7 million. Moreover, as of the day before March 1, 1991, the beginning of the preference period, the accounts receivable listed totalled about half of the amount listed on the date of filing. Since the liabilities of the Debtor, particularly its large indebtedness to Lauderhill, remained fairly stable throughout the 90–day period, it is clear that the Debtor was in fact insolvent at all pertinent times. Therefore, if Lauderhill's evidence was sufficient to "burst" the presumption "bubble," the Debtor rather easily met its burden of proving insolvency by a preponderance of the evidence.

■ The Debtor indisputably bears the burden of proving the element of Lauderhill's benefit over what it would recover in a Chapter 7 case by receipt of the payments in issue, as required by 11 U.S.C. § 547(b)(5). *See* 11 U.S.C. § 547(g); *In re E & S Comfort, Inc.,* 92 B.R. 616, 620 (Bankr.E.D.Pa.1988); and *In re Rimmer Corp.,* 80 B.R. 337, 338–40 (Bankr.E.D.Pa. 1987). However, unless the creditor receiving the preferential payment is secured, as in *Rimmer, id.* at 339–40, or the preference-action plaintiff succeeds on establishing insolvency only through the presumption of 11 U.S.C. § 547(f), the § 547(b)(5) requirement often mirrors that of § 547(b)(3). If a debtor's liabilities exceed its assets, an unsecured creditor is sure to receive less in a Chapter 7 case than it received in recovering the one hundred (100%) percent payment of its claim through the payment of the transfer alleged to be preferential.

Unlike the trustee in *E & S, supra,* 92 B.R. at 620 & n. 3, the Debtor has presented ample evidence that its assets exceed its liabilities and that a one hundred (100%) percent payment to unsecured creditors is unlikely. Moreover, the abundance of litigation connected with this case, plus the

possible right of Lauderhill to a substantial administrative claim, assures that recoveries of unsecured creditors will be further whittled down.

In sum, the requirements of both § 547(b)(3) and of § 547(b)(5) are rather easily made out by the Debtor on this record.

3. THE DEBTOR SATISFIES THE OTHER REQUIREMENTS OF § 547(b) AS TO ALL OF THE TRANSFERS IN ISSUE EXCEPT THE LAST TWO LETTER OF CREDIT DRAWS; IN PARTICULAR, THE PAYMENTS OF LINDO TO LAUDERHILL DO NOT REPRESENT PROCEEDS OF "ASSIGNMENTS."

■ One of the most persistent and quantitatively significant defenses raised by Lauderhill is that the Debtor assigned Lindo's various payments to Lauderhill in February, 1991, prior to the preference period, and therefore those payments were not "transfers of *the debtor*" within the requisite period.

■ This issue is significant because the payments from Lindo (transfers three, four, seven, and nine) total $1,024,062.54. However, Lauderhill's argument that a pre-preference-period assignment occurred is supported by basically only one scrap of evidence: Steven's statement, in the February 22, 1991, letter to Lauderhill that it will pay Lauderhill in full from the proceeds of its settlement with Lindo. Patently, this is insufficient proof of an assignment of Lindo's payments to Lauderhill.

An assignment is

[a] transfer or making over to another of the whole of any property, real or personal, in possession or in action, or of any estate or right therein.

BLACK'S LAW DICTIONARY 109 (5th ed. 1979). *Accord,* 6 AM.JUR.2d 185 (1963). The absolute and complete nature of an assignment is emphasized, under applicable Florida law, by the fact that

when such assignment is made the property rights become vested in the assignee so that the assignor no longer has any interest in the account or chose which he may substantially assign to another. *Salem Trust Co. v. Manufacturers Finance Co.*, 1924, 264 U.S. 182, 44 S.Ct. 266, 68 L.Ed. 628, 31 A.L.R.1967; *see also* cases digested 31 A.L.R. 879–882 and 110 A.L.R. 775–778.    ·

*Boulevard Nat'l Bank of Miami v. Air Metals Industries, Inc.*, 176 So.2d 94, 97 (Fla.1965). Thus, the "true test" of an assignment is "whether the debtor would be justified in paying the debt to the person claiming as assignee." *Giles v. Sun Bank, N.A.*, 450 So.2d 258, 260 (Fla.App.1984), citing *McClure v. Century Estates*, 96 Fla. 568, 120 So. 4, 10 (1928). *See also Brager v. Blum*, 49 B.R. 626, 629 (E.D.Pa.1985); *In re Robert T. Noel Coal, Inc.*, 82 B.R. 778, 780 (Bankr.W.D.Pa.1988); *In re Ashford*, 73 B.R. 37, 39 (Bankr.N.D.Tex.1987); *In re Flanders*, 45 B.R. 222, 224 (Bankr. M.D.Ga.1984); and *DeCespedes v. Prudence Mut. Cas. Co.*, 193 So.2d 224, 227 (Fla.App.1966), *aff'd*, 202 So.2d 561 (Fla. 1967). *Cf. In re Carter*, 126 B.R. 811, 813 (Bankr.M.D.Fla.1991) (assignment of rents transfers absolute ownership of rents to secured party); and *In re 163rd St. Mini Storage, Inc.*, 113 B.R. 87, 89–90 (Bankr. S.D.Fla.1990) (same).

█ The letter of February 22, 1991, expresses, at most, an offer of the Debtor to pay Lauderhill out of a particular fund, *i.e.*, the proceeds received by it from Lindo. This offer was apparently rejected by MacInnes' letter of March 18, 1991. Even had this offer been accepted, a promise to pay a debt out of a particular fund does not constitute an assignment of the fund. *See Ashford, supra*, 73 B.R. at 39; and *In re Coughlin*, 48 B.R. 191, 194 (Bankr.E.D.Pa. 1985).

It is very doubtful whether an assignment was effected by the Debtor's letter of March 12, 1991, to Lindo, or the letter of April 1, 1991, confirming a settlement between the parties, either. The letter to Lindo expressly states that Lindo's authority to pay Lauderhill is *not* irrevocable.

*See Noel Coal, supra*, 82 B.R. at 780 (an assignment for consideration is irrevocable). The April 1, 1991, agreement-letter states only that there *will* be an assignment if certain future events occur. The contemplated events did not occur. Moreover, neither of these documents express the requisite unconditional intention to render Lindo thereafter liable *only* to Lauderhill and not to the Debtor. We note that the Debtor and not Lauderhill has pursued accounts receivable from Lindo by proceedings in this court. In any event, since postpetition assignments of payments due to the Debtor from Lindo, if reflected in the March 12, 1991, and April 1, 1991, documents, would in any event constitute transfers within the preference period which might be avoidable, the validity of these alleged post-petition events of assignment are immaterial to the outcome of this proceeding. *Cf. In re Air Conditioning, Inc. of Stuart*, 845 F.2d 293, 296 (11th Cir.), *cert. denied sub nom. First Interstate Credit Alliance Inc. v. American Bank of Martin County*, 488 U.S. 993, 109 S.Ct. 557, 102 L.Ed.2d 584 (1988) (pledge of assets in preference period constitutes a transfer).

Therefore, we conclude rather easily that no assignment to Lauderhill of payments due to the Debtor from Lindo occurred within the relevant pre-petition period. The payments received by Lauderhill from Lindo therefore qualify as preferential payments under § 547(b) of the Code.

█ At trial, Lauderhill also attempted to argue that the April 26, 1991, payment did not satisfy the "antecedent debt" requirement of 11 U.S.C. § 547(b)(2) because it was a replacement for a check which, by agreement, was to be a prepayment of the April payment. However, the significant date for measuring when the April 26, 1991, payment was made was the date that the replacement payment itself was made, not the date when the payment which it replaced was supposed to have been made. Moreover, a debt is "incurred" at the earlier of the date when services are provided or when the parties' contract or independent agreement calls

for payment. *In re American Int'l Airways, Inc.*, 68 B.R. 326, 332 (Bankr.E.D.Pa. 1986), *aff'd*, C.A. No. 87–1287, 1987 WL 54484 (E.D.Pa. May 12, 1987) (*"AIA II"*). The debt arising from the Debtor's April, 1991, obligation was therefore incurred as of the date that the Debtor agreed to pay it. In any event, the actual payment was late and hence was "antecedent" to the April obligation.

Lauderhill also argued, in the early stages of this proceeding, that the first payment in issue should have been considered "made," for purposes of 11 U.S.C. § 547(b)(4)(A), when the Debtor delivered the check, on February 27, 1991, which is outside the preference period, rather than when it was honored, on March 1, 1991, a date within the preference period. However, this argument was foreclosed by the decision of the Supreme Court in *Barnhill v. Johnson*, ―― U.S. ――, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992), which established the honor-date of a check as the significant date for purposes of § 547(b)(4)(A). *See also AIA II, supra*, 68 B.R. at 335.

However, one argument of Lauderhill is clearly correct. The last two alleged preferential transfers reflected draws by Meridian to Lauderhill on the letter of credit. It is well-established that draws upon letters of credit are not in and of themselves transfers of an interest of the debtors in property. *See In re Compton Corp.*, 831 F.2d 586, 589–90 (5th Cir.1987). *Accord, Air Conditioning, supra*, 845 F.2d at 296. *Cf., e.g., In re Prime Motor Inns, Inc.*, 130 B.R. 610, 613 (S.D.Fla.1991); and *In re Delaware River Stevedores, Inc.*, 129 B.R. 38, 40–41 (Bankr.E.D.Pa.1991) (letters of credit are not property of a debtor's estate). Instead, a transfer in connection with a letter of credit is made when the debtor pledges its assets in consideration for the issuance of the letter of credit. *Air Conditioning, supra*, 845 F.2d at 296; and *Compton*, 831 F.2d at 590.

The Debtor pledged its assets to Meridian in consideration for its issuance of the letter of credit in November, 1990. November, 1990, is therefore the date when a transfer relevant to the letter of credit may be made. Thus, the transfer of the $1 million included in the letter of credit in issue was effected prior to the preference period, not when Lauderhill drew on the letters of credit on May 28, 1991, and May 30, 1991. These latter two payments are therefore not preferential transfers.

4. WHILE LAUDERHILL HAS A VIABLE 11 U.S.C. § 547(c)(4) DEFENSE AS TO A SUBSTANTIAL PORTION OF THE PAYMENTS IN ISSUE, IT CANNOT EXCLUDE THE $1 MILLION LETTER OF CREDIT DRAWS AS PAYMENTS TOWARDS NEW VALUE.

Lauderhill has wisely not asserted the defense that the payments in issue were in the "ordinary course of business," within the scope of 11 U.S.C. § 547(c)(2). In order to establish a successful defense under 11 U.S.C. § 547(c)(2), the burden is upon the transferee, *see* 11 U.S.C. § 547(g), to prove that the transfer was *both* in the ordinary course of dealings between the parties, 11 U.S.C. § 547(c)(2)(B), *and* made according to ordinary terms in the industry generally. 11 U.S.C. § 547(c)(2)(C). *See, e.g., In re Fred Hawes Organization, Inc.*, 957 F.2d 239 (6th Cir.1992); *Samar Fashions, Inc. v. Private Line, Inc.*, 116 B.R. 417, 419 (E.D.Pa.1990); *In re Atlantic Fish Market, Inc.*, 100 B.R. 755, 756 (Bankr.E.D.Pa.1989); and *In re American Int'l Airways, Inc.*, 83 B.R. 324, 332–33 (Bankr.E.D.Pa.1988), *aff'd*, C.A. No. 88–3529 (E.D.Pa. August 25, 1988), *rev'd on other grounds sub nom. Begier v. United States*, 878 F.2d 762 (3d Cir.1989), *aff'd sub nom. Begier v. Internal Revenue Service*, 496 U.S. 53, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990). As the Debtor attempted to stave off Lauderhill from seeking the return of its vehicles and destroying the Debtor's business, the Debtor proposed, in the payment transactions in issue, a series of terms which were unprecedented in the parties' prior course of dealing and were not proven to be in any sense "ordinary" in the vehicle-rental industry. It is therefore clear that Lauderhill could not prove the

elements of either § 547(c)(2)(B) or § 547(c)(2)(C) as to the payments in issue.

■ However, the application of § 547(c)(4) is clear. As we observed in *LAF III, supra,* 140 B.R. at 845, Lauderhill's continuing supply of vehicles to the Debtor was absolutely crucial to the Debtor's continued operations. Lauderhill clearly did continue to supply vehicles to the Debtor pre-petition, as well as post-petition.

In *In re New York City Shoes, Inc.,* 880 F.2d 679 (3d Cir.1989), the Court of Appeals addressed the elements and underlying policies of § 547(c)(4) in detail. As to the elements of this defense, the Court held, *id.* at 680, that

> [t]he three requirements of section 547(c)(4) are well established. First, the creditor must have received a transfer that is otherwise voidable as a preference under § 547(b). Second, *after* receiving the preferential transfer, the preferred creditor must advance "new value" to the debtor on an unsecured basis. Third, the debtor must not have fully compensated the creditor for the "new value" as of the date that it filed its bankruptcy petition.

As to the policies behind § 547(c)(4), the Court held, *id.* at 680–81, as follows:

> Section 547(c)(4) has two interrelated purposes. First, the section is designed "to encourage trade creditors to continue dealing with troubled businesses." *In re Gold Coast Seed Co.,* 30 B.R. 551, 553 (Bankr. 9th Cir.1983). In the ordinary course of business, suppliers provide goods to businesses on credit. The financial pressure that would result if creditors were to force an ailing company to pay for supplies upfront could turn many a troubled company into a bankruptcy one. By allowing creditors to rely on payments of back debt in shipping new goods, section 547(c)(4) serves

the purpose of avoiding unnecessary bankruptcies.

> Second, section 547(c)(4) is designed to "treat fairly a creditor who has replenished the estate after having received a preference." [*In re*] *Almarc* [*Manufacturing, Inc.*], 62 B.R. [684] at 688 [ (Bkrtcy.N.D.Ill.1986) ]. *See also In re American International Airways, Inc.,* 68 B.R. 326, 337 (Bankr.E.D.Pa.1986) (Section 547(c)(4) "protects creditors who deal with financially unstable businesses and reasonably rely on their payments as a consideration for proving these future services")....

It is clear, as noted in the court's recitation of the third prerequisite for invocation of § 547(c)(4), that § 547(c)(4) can be invoked only as to "new value" which has not been subsequently paid for by the Debtor. *Accord, In re American Int'l Airways, Inc.,* 56 B.R. 551, 554–55 (Bankr. E.D.Pa.1986) ("*AIA I*"). *Contra, In re Isis Foods, Inc.,* 39 B.R. 645, 653 (W.D.Mo. 1984).

On the other hand, we reject the Debtor's arguments that consideration of the provision of new value to the Debtor by Lauderhill must be stopped as of May 7, 1991, when Lauderhill sent the Debtor a notice of default and demanded return of its leased vehicles, or as of May 24, 1991, when Lauderhill rather politely "requested" that the Debtor's customers return the vehicles leased from the Debtor to it.[2] The important consideration is not whether Lauderhill happily or voluntarily supplied new value to the Debtor, but whether it actually did provide new value to it. *See Charisma Investment Co., N.V. v. Air Florida Systems, Inc.,* 68 B.R. 596, 602–93 (S.D.Fla.1986), *aff'd sub nom. In re Jet Florida System, Inc.,* 841 F.2d 1082 (11th Cir.1988); *In re Ford,* 98 B.R. 669, 682 (Bankr.D.Vt.1989); and *AIA II,* 68 B.R. at 331–32 (debt is incurred when service is used). *Cf. LAF III* (Lauderhill is entitled to an administrative claim for post-petition

---

**2.** This politeness was probably calculated to allow the Debtor's customers to retain the vehicles if they wished, but become customers of Lauderhill in the future. The Debtor's contention that Lauderhill's course of dealing with it, both pre-petition and post-petition, was a scheme calculated to drive it out of business and steal its customers is the essence of the Debtor's claims in the district court litigation.

services despite the aforesaid alleged pre-petition actions of Lauderhill).

■■■ The important and rather novel remaining issue under § 547(c)(4) is whether Lauderhill's draws on the $1 million letter of credit from Meridian are counted as payments towards the new value supplied by Lauderhill to the Debtor. At the outset, we stress that this is a different issue than whether the draws on the letter of credit can be considered as preferential payments themselves. While draws on letters of credit are not preferences, "[w]aiving a banner acclaiming the unavoidability of letters of credit," *Air Conditioning, supra,* 845 F.2d at 296, does not preclude consideration of the draws for at least certain purposes.

Two decisions have addressed the specific relevant issue of whether draws on letters of credit should be considered to be payments towards new value. In *In re Formed Tubes, Inc.,* 46 B.R. 645, 647 n. 4 (Bankr.E.D.Mich.1985), the court analyzes the issue thusly:

> It is the impact of the payment on the estate and not the source of the payment that is determinative as to whether section 547(c)(4) is available as a defense to a creditor who has received a preferential transfer. If payment by a third party has the effect of removing from the estate the new value advanced, then the section 547(c)(4) exception is not and should not be available to the creditor. If the bank had been fully secured, it would have been able to recover the entire ... payment it made to [the defendant] from the estate. The payment to [the defendant] would thus have had the same impact upon the estate as a payment made directly by the debtor. Accordingly, if the bank had been fully secured, the section 547(c)(4) defense would not have been available to [the defendant].

However, *Formed Tubes* involved a liquidated debtor whose assets were sold, prior to the litigation of the preference action, for much less than the amount of the secured claim of the bank on which the letter of credit was drawn. *Id.* at 646. Conse-

quently, the payment of the letter of credit by the bank, in that case, was found to have diminished the resources of the bank, not those of the debtor. *Id.* at 647. Therefore, in that circumstance, the defending creditor was able to successfully argue that the draw on the letter of credit did not deplete the Debtor's estate and should therefore not be counted as a payment of the Debtor against new value.

The reasoning of *Formed Tubes* was expressly adopted in *In re Kroh Bros. Development Co.,* 930 F.2d 648, 652–54 (8th Cir. 1990). *Kroh Bros.* involved a preference action in which the lower courts allowed the defending creditor to assert a § 547(a)(4) defense "even though [the defendant] had been paid for at least some of the new value" by a third party. *Id.* at 650.

The Court of Appeals reversed the lower court decisions, stating, *id.* at 653, that,

> [t]o the extent that the opinions of the bankruptcy and district courts can be read to hold that a creditor who has been paid for new value *by the debtor* can nevertheless assert a new value defense, we disagree.

It held, *id.* at 654, that

> if the creditor receives payment from a third party who has a secured claim against the estate, the relative positions of the creditor and estate change. If allowed to assert the new value defense, the creditor would be entitled to retain the preference to offset against the new value even though the creditor also received a cash payment for the new value from the third party. The position of the creditor would be better than if the preference had not been made. This beneficial effect on the creditor, however, is not decisive. The rationale behind preference avoidance, distributive equality, compels us to consider whether the preference retention is to the detriment of other creditors. In the case of payment by a secured third party, the estate would indeed be diminished. Because the third party who paid the creditor would be able to assert a secured claim against the estate for the amount of the

new value, the new value would deplete rather than replenish the estate insofar as unsecured creditors are concerned. *See In re Formed Tubes*, 46 B.R. at 647 n. 4. The availability of the defense, then, depends on the ultimate effect on the estate.

The Court remanded the proceeding at issue to the bankruptcy court to determine whether and to what extent the Debtor's estate was depleted by the transfer in issue.

Lauderhill makes two responses to the application of the reasoning of *Formed Tubes* and *Kroh Bros.* to the instant facts. First, it suggests that those decisions were incorrect because § 547(c)(4)(B) refers only to circumstances where "the debtor," and not third parties, have made an otherwise avoidable transfer for the creditor's benefit. This argument, however, overlooks the policy considerations underlying § 547(c)(4), which the Court of Appeals articulated in *New York City Shoes, supra,* 880 F.2d at 680–81. *See* page 864 *supra.* It is difficult to see how Lauderhill's actions can be said to have been motivated by a desire to help a troubled business, when its new value was compensated by the payment of a letter of credit. Rather, it appears to have been motivated by receipt of money. The Debtor's estate was, moreover, not replenished if it was depleted by draws on the letter of credit which in turn diminished the assets of the Debtor's estate. Therefore, we conclude that the reasoning of *Kroh Bros.* and *Formed Tubes,* when viewed in light of the policies articulated in the controlling decision in *New York City Shoes,* are accurate and appropriate, and we will follow the reasoning of those cases.

The second argument attacks the validity of Meridian's secured claim against the Debtor, in an attempt to establish that the draws on the letter of credit should not be found to have depleted the Debtor's estate, but should instead be found to have fallen upon Meridian. However, Lauderhill's challenges to Meridian's status have all of the attributes of scatter-gun attack. Invoked in rapid and short-range fire are the assertions that (1) the Debtor's assets had a fair market value of less than $1 million at, presumably, the date of enforcement of its lien; (2) Meridian improperly claimed that its security interest on the Debtor's assets arose from the obligation of *Donald* on the letter of credit; (3) Meridian's security interest was lost by the commingling of funds in the Debtor's bank account; (4) Meridian's claim of set-off was improper because it ignored a senior interest of UVB; and (5) since it was alleged undersecured, Meridian's setoff violated 11 U.S.C. § 553(b).

The difficulty with each of these assertions is that they are not proven under the facts on the record, and the burden of proving all elements of any § 547(c)(4) defense is upon Lauderhill. *See* 11 U.S.C. § 547(g). It is not proven that the Debtor's accounts receivable had a market value of less than $1 million at the relevant period of the draws on the letters of credit, just prior to the bankruptcy filing. Monagle testified that the market value of the Debtor's accounts receivable, at filing, was approximately $5 million, well in excess of $1 million. There was no evidence to rebut the testimony of Donald and the Meridian representative that, while the letter of credit was issued to Donald individually, it was issued solely for the benefit of the Debtor and was voluntarily and intentionally, on the part of the Debtor, secured by the Debtor's assets. There is no evidence that UVB has so much as a claim of a security interest prior to Meridian, and there is certainly no evidence that it has such a claim in an amount sufficient to render Meridian's claim of a security interest in the Debtor's accounts undersecured, even if Meridian's claim were junior to any claim of UVB. Finally, unless and until Meridian's security interest is avoided, it is valid. *See* page 860 *supra.*

There was unrebutted evidence that the Debtor had a $56,000 account balance with Meridian at the time that the letters of credit were drawn upon, and that Meridian set off its indebtedness to the Debtor represented by this account and debited its account for $944,000 after paying on the letter of credit. However, the Debtor lost

both the $56,000 account and $944,000 of previously unencumbered accounts receivable as a result of the draws. Therefore, its estate was depleted by $1 million as a result of Lauderhill's draws on the letter of cadit. It is therefore proper, under the reasoning of *Kroh Bros.* and *Formed Tubes*, to treat this $1 million depletion of its assets and enhancement of Lauderhill's assets as a $1 million payment to Lauderhill towards new value for purposes of a § 547(c)(4) analysis.

5. CALCULATION OF THE AMOUNT WHICH THE DEBTOR IS DUE AND EFFECTS THEREOF.

▉ The only matter remaining at issue is the calculation of the avoidability and amount of each of the preferential payments in issue, based upon the principles resulting from the foregoing findings of fact and conclusions of law. The calculation formula utilized is to, first, determine the total of the payments made, including that particular preferential payment, from that date through to the date of the bankruptcy filing on May 30, 1991. We will, of course, count the $1 million draws on the letter of credit in this calculation and they will be the last of the payments. We will thus subtract from the total of payments made the total new value supplied, from the date of each particular transfer through May 30, 1991, utilizing the per diem rates proposed by Biddick and adopted and hence apparently not contested by Mallenbaum. This approach appears consistent with the analysis made by the courts in *Leathers v. Prime Leather Finishes Co.*, 40 B.R. 248, 250 (D.Me.1984); and *AIA I, supra*, 56 B.R. at 553.

The resulting calculations for each of the nine remaining preferences, after our exclusion of the draws on the letter of credit from the preferential transfers in issue, are as follows:

1. $755,830.00 (March 1, 1991)

| | | |
|---|---|---|
| Payments | $5,269,748.97 | |
| New Value | 4,325,826.26 | |
| Net Preference | $ 953,922.71 | |
| Amount Voidable | | $755,830.00 |

2. $105,000.00 (March 12, 1991)

| | | |
|---|---|---|
| Payments | $4,513,918.97 | |
| New Value | 3,745,584.50 | |
| Net Preference | $ 768,334.47 | |
| Amount Voidable | | $105,000.00 |

3. $607,021.49 (March 15, 1991)

| | | |
|---|---|---|
| Payments | $4,408,918.97 | |
| New Value | 3,590,064.02 | |
| Net Preference | $ 818,854.95 | |
| Amount Voidable | | $607,021.49 |

4. $142,241,95 (March 19, 1991)

| | | |
|---|---|---|
| Payments | $3,801,897.48 | |
| New Value | 3,382,703.68 | |
| Net Preference | $ 419,194.10 | |
| Amount Voidable | | $142,241.05 |

5. $600,000.00 (March 29, 1991)

| | | |
|---|---|---|
| Payments | $3,659,656.43 | |
| New Value | 2,708,781.30 | |
| Net Preference | $ 950,875.13 | |
| Amount Voidable | | $600,000.00 |

6. $620,802.00 (April 1, 1991)

| | | |
|---|---|---|
| Payments | $3,059.656.43 | |
| New Value | 2,708,781.30 | |
| Net Preference | $ 350,784.13 | |
| Amount Voidable | | $350,784.13 |

| | | | |
|---|---|---|---|
| 7. | $82,500.00 (April 15, 1991) | | |
| | Payments | $2,438,854.43 | |
| | New Value | 2,035,391.19 | |
| | Net Preference | $ 403,463.33 | |
| | Amount Voidable | | $ 82,500.00 |
| 8. | $1,164,054.43 (April 26, 1991) | | |
| | Payments | $2,356,354.10 | |
| | New Value | 1,506,298.80 | |
| | Net Preference | $ 850,055.03 | |
| | Amount Voidable | | $850,055.03 |
| 9. | $192,300.00 (May 20, 1991) | | |
| | Payments | $1,192,300.00 | |
| | New Value | 464,127.51 | |
| | Net Preference | $ 728,172.43 | |
| | Amount Voidable | | $192,300.00 |

---

On May 20, 1992, we shared some of the tentative conclusions which appear in this Opinion with interested counsel and asked them what they thought would be the effect of our finding that all of the transfers were, at least in part, preferential. The Debtor's counsel agreed that the Debtor was not entitled to recover the cumulative effect of all of the preferential payments. We agree that it would be grossly inequitable, counterintuitive, and contrary to the purposes served by § 547(c)(4) to so rule. If all of the transfers could be avoided, the result would be that, despite having received new value of $4,325,826.26 over the entire pertinent post-transfer period from Lauderhill and having paid only $5,269,748.97 during this period, the Debtor would recover the sum of the amounts avoidable in all nine transactions, which would equal almost $3.7 million.

Rather, we believe that we must assume that, if a judgment is entered against Lauderhill as to any particular transfer, this sum would be paid to the Debtor. Lauderhill should then receive credit for payment of that amount against any other avoidable transfer in this series. Consequently, we conclude that the Debtor should rightfully recover a judgment for only the largest of the avoidable transfers. Our calculations indicate that the largest amount recovera-

ble would be $850,055.03, arising from transfer number nine, on April 26, 1991. Therefore, judgment should be entered in favor of the Debtor in "only" this amount, *i.e.*, $850,055.03.

Having determined that Lauderhill is liable to the Debtor in this amount, we must now consider the effect which this judgment will have upon the plan confirmation process and, more specifically, Lauderhill's motion for temporary allowance of its claim in the amount of at least $3 million for voting purposes. The Debtor opposed this motion by contending that Lauderhill was liable to it for a substantial sum in this proceeding and was obliged to liquidate this liability before being entitled to vote at all, on the basis of 11 U.S.C. § 502(d), which provides in pertinent part as follows:

> (d) ... the court shall disallow any claim of any entity ... that is a transferee of a transfer avoidable under section ... 547, ... of this title, unless such entity or transferee has paid the amount, ... for which such entity or transferee is liable. ...

Unless and until Lauderhill pays the sum of $850,055.03 determined herein to be due to the Debtor, all of its claims in this case must be disallowed.[3] Therefore, we will also proceed to deny Lauderhill's motion to

---

**3.** This would also appear to include Lauderhill's administrative claim, which is the subject of

*LAF III.*

temporarily allow its claim in any amount at this time as well.

## D. CONCLUSION

An Order entering judgment in favor of the Debtor in the amount of $850,055.03 in this proceeding and denying Lauderhill's motion to temporarily allow its claim for purposes of voting will be entered.