**In re Charles Patrick LEWIS, Jane Anne Lewis, Debtors.**

**Bankruptcy No. 92–13071S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Aug. 5, 1993.

Matthew R. Nahrgang, Koresko & Associates, Norristown, PA, for debtors.

Wendy G. Rothstein, Lansdale, PA, for Harleysville Nat. Bank.

David J. Toll, Patterson & Weir, Philadelphia, PA, for Royal Bank of Pennsylvania.

Howard Gershman, Boroff, Harris & Heller, P.C., Plymouth Meeting, PA, for Empire Sav. of America.

Jeffrey D. Cooper, Philadelphia, PA, for Cornell & Co.

Ina S. Weiner, I.R.S., Philadelphia, PA, for I.R.S.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant objections of a creditor to confirmation of the Debtors' Chapter 11 Plan cause us to consider the validity of that creditor's two separate alleged security interests arising out of two separate rather convoluted transactions. As to one transaction, we conclude that a post-petition agreement giving a priority to the interest of another creditor, approved by the court after notice to all interested parties, including the objecting creditor, binds that creditor and allows avoidance of that security interest asserted as a result. As to the other transaction, we hold that the relevant pre-petition agreements are avoidable, thereby invalidating the other alleged security interest. The susceptibility of both of these security interests to attack renders the Debtors' plan of reorganization, which reflects a partial recognition of these security interests, if anything, more than "fair and equitable" as to the objecting creditor and permits confirmation to occur.

### B. PROCEDURAL HISTORY

CHARLES PATRICK LEWIS ("the Husband") and JANE ANNE LEWIS (collectively "the Debtors") filed the underlying joint voluntary Chapter 11 bankruptcy case on May 20, 1992. Their initial plan of reorganization, filed September 21, 1992, terminated with an Order of December 10, 1992, which acknowledged the Debtor's inability to confirm their initial plan, but granted them express permission to attempt to file an amended plan. Ultimately, the Debtors proposed a Third Modified Plan ("the 3rd Plan") which progressed to a confirmation hearing of May 19, 1993.

Three creditors filed Objections to confirmation of the 3rd Plan: (1) Cornell & Co. ("Cornell"), an unsecured creditor which contended that the absolute priority rule was violated because its class, to be paid from a $100,000 fund and twenty-five (25%) percent of the net proceeds from the sale of the Debtors' most valuable realty asset, a Pottstown, Pennsylvania, office building known as "the New York Plaza" ("the Plaza"), fell narrowly short of accepting the 3rd Plan; (2) Empire Savings of America ("Empire"), the mortgagee of the Debtors' present residential realty in Gilbert, Arizona, a suburb of Phoenix, the interest rate of whose claim was to be reduced to six (6%) percent; and (3) Harleysville National Bank & Trust Co. ("HNB"), which claimed, as security interests, (a) a mortgage second to that of Royal Bank of Pennsylvania ("Royal") in the Plaza; and (b) $422,000 in proceeds paid to the Debtors by their mortgagees, Elliot and Susan Menkowitz (collectively "Menkowitz"). Under the terms of the 3rd Plan, HNB was to be paid $150,000 cash at the time of confirmation and to receive a restated second mortgage of $575,000 on the Plaza in addition.

The 3rd Plan was actively supported by Royal, which had agreed to accept a restated first mortgage of $815,000 on the Plaza in addition to a cash payment of $200,000 at confirmation.

After the hearing, we observed that Cornell's objection would be overcome if the Debtors added a ballot by Household Realty Credit Services, which failed to designate the class of its claim, to the votes of the unsecured claims, as the hearing testimony of the Husband indicated would be appropriate. We also found that, by in-

creasing the interest rate payable to Empire to 8.1%, the Debtors would overcome Empire's objection. As to the claims and respective secured statuses of HNB and Royal, we expressed a need to review their respective proofs of claim, to which no objections had been filed. Since neither creditor seemed clear as to the content of their proofs of claim or whether they had in fact filed same, we expressed a possible need to examine the Debtors' listing of their respective claims on their schedules as well before rendering a decision as to confirmation. *See* Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 3003(c)(2) (a claim not scheduled as designated, contingent, or unliquidated must be allowed as scheduled unless a contrary claim is filed).

Our post-hearing review revealed that neither HNB nor Royal had in fact ever filed a proof of claim in this case. However, we also noted, despite an erroneous notation of a January 15, 1993, bar date on the claims docket, that no bar date for filing claims had been established.

We thereupon entered an Order of May 21, 1993, which, *inter alia*, established a bar date for filing all proofs of claim at June 10, 1993; required the Debtors to file an amendment to the Plan and to their Report of Plan Voting to overcome the Objections of Empire and Cornell, respectively, on or before June 14, 1993; and scheduled a supplemental hearing to consider confirmation of the anticipated Fourth Modified Plan ("the 4th Plan"), with hearings on anticipated objections to proofs of claim filed by the Debtors, on June 30, 1993.

On May 20, 1993, prior to the entry of this Order, HNB apparently discovered it had not filed a proof of claim and proceeded to file a claim (No. 28) in the amount of $1,065,573.32, allegedly secured by its second mortgage on the Plaza and its interest in the proceeds of a Note, as described *infra*. On June 10, 1993, Royal filed a claim (No. 29) in the amount of $2,644,-872.61, allegedly secured by its first mortgage on the Plaza and a Cross–Collaterization/Cross Default Agreement dated October 13, 1989, also referencing a property of the Debtors in addition to the Plaza ("the CC Agreement"). On June 11, 1993, the Debtors filed a 4th Plan which kept Empire's interest rate at that of the original loan, and provided for merely some modest forbearance; an Amended Report of Plan Voting which reflected acceptance of the 4th Plan by the unsecured class; and an Objection to HNB's claim. On June 17, 1993, HNB filed Objections to confirmation of the 4th Plan, and, on June 18, 1993, HNB filed an Objection to Royal's claim.

On June 30, 1993, the parties' counsel appeared and recited an agreement to submit (1) HNB's Objection to Royal's claim; (2) HNB's pending motion for relief from the automatic stay, filed on May 3, 1993; (3) the Debtor's Objection to HNB's claim; and (4) confirmation of the 4th Plan and HNB's Objections thereto (the only remaining Objections) on the record made at the May 19, 1993, hearing; two supplemental Stipulations of Facts; and a series of briefs. Per an Order of July 1, 1993, we set a schedule of various briefings which were to be completed by July 29, 1993. On July 21, 1993, we supplemented the briefing schedule to allow HNB to respond to issues raised by Royal in its brief in support of its Objection to Royal's claim which had not been addressed in its opening brief. Short extension requests were denied, and the parties filed all submissions in timely fashion.

## C. FACTUAL HISTORY

As is noted at page 1 *supra*, the facts of two rather convoluted transactions, independent from each other, are pertinent to the resolution of this dispute. The first of these transactions we will term "the Menkowitz Transaction." The second is designated as "the Plaza Transaction."

### 1. THE MENKOWITZ TRANSACTION

We begin our recitation of the facts of the Menkowitz Transaction by observing that, on September 1, 1987, Menkowitz executed a note ("the Menkowitz Note") in favor of the Debtors in the principal amount of $725,000, secured by a mortgage on two properties owned by Menkowitz.

The Menkowitz Note provided for a five-year term with a balloon payment due and owing on October 1, 1992, as well as for the Menkowitz' making $6,845.38 monthly payments at a fixed interest rate of ten and a half (10½) percent to the Debtors.

On September 1, 1990, the Debtors executed a document entitled "Assignment of Note and Mortgage" of Menkowitz ("the Assignment") in favor of Mellon Bank East, PSFS National Association ("Mellon"). However, despite the Assignment, Menkowitz continued to make monthly mortgage payments directly to the Debtors in the amount of $6,845.38 and stopped only after they were served with certain attachment papers by HNB, as described *infra.*

On December 19, 1990, HNB confessed judgment against the Debtors in accordance with a personal guarantee which HNB had obtained from them in reference to the outstanding obligations of the Debtors' former business, Lewis Fabricating Company, Inc., in an amount exceeding $1,400,000. On September 12, 1991, HNB began attachment proceedings against Menkowitz as to any funds due and owing from them to the Debtors. Following service of the attachment pleadings on September 17, 1991, Menkowitz indicated, in answer to interrogatories served upon them in the course of that proceeding, that, as of September 20, 1991, they owed the Debtors $695,234.90 payable in monthly installments of $6,845.38 with a balloon payment due and owing on October 1, 1992. As of the date attachment papers were served on Menkowitz, the Debtors were current on their outstanding obligations with Mellon and payments were still being made directly to the Debtors by Menkowitz.

On November 19, 1991, HNB entered judgments in its favor and against Menkowitz as garnishees of the Debtors in the amount of $695,234.90 in the attachment proceeding. Thereafter, Menkowitz forwarded their next monthly mortgage payment directly to HNB.

At that point, however, Mellon claimed a prior right to receive the monthly mortgage payments, and a dispute as to who had first priority to receive the proceeds from the Menkowitz Note arose between HNB and Mellon. In resolution of this dispute, HNB executed two Settlement Agreements of December 13, 1991, of the precise same terms ("the Agreements"), one with Mellon, endorsed by the Debtors, and one with the Debtors. Therein, the parties agreed that Mellon would have first priority on the Menkowitz Note proceeds and HNB would have "a second lien" thereon payable after Mellon had been paid in full.

In accordance with the Agreements, HNB satisfied various liens that it had on properties owned by the Debtors and the Menkowitz mortgage payments were sent directly to Mellon with copies of the checks mailed to HNB monthly.

In September, 1992, Menkowitz expressed a desire to pay off the Note. Counsel for the Debtors advised HNB that, in order for the settlement to be facilitated and for the Menkowitz Note to be paid in full, HNB would have to dissolve its attachment against the Note. In correspondence with HNB, the Debtors' counsel agreed that its plan would pay HNB $375,000 upon confirmation and $350,000 pursuant to a reconstituted mortgage on the Plaza. The Debtors' counsel also stated, in a letter to HNB's counsel, that "your release will not constitute a waiver of your right to assert your lien on the $375,000 if our Plan is not confirmed, nor a waiver of any other rights you may have."

The initial plan of the Debtors, which could not be confirmed, contemplated a $375,000 payment to HNB in accordance with the parties' September, 1992, agreement. However, in the 3rd Plan and the 4th Plan, as noted at page 3 *supra,* the upfront payment by the Debtors to HNB was reduced to $150,000 (and the amount of the reconstituted mortgage increased to $575,000).

## 2. *THE PLAZA TRANSACTION*

We begin our recitation of the facts of the Plaza Transaction as of September 28,

1988, when the Debtors obtained a loan from Royal in the amount of $1,750,000 secured by a mortgage on a certain Lansdale property of the Debtors. Subsequently, on October 13, 1989, Royal granted an additional loan to the Debtors in the amount of $750,000 secured by a first mortgage on the Plaza. On that same date, the Debtors and Royal also executed the CC Agreement. However, Royal never recorded the CC Agreement.

On December 19, 1990, HNB, as noted above, confessed judgment against the Debtors in an amount in excess of $1,400,-000, and thereby obtained a judicial lien on the Plaza in that amount. Subsequently,

on May 9, 1991, HNB recorded a second mortgage on the Plaza in the amount of $1,400,000. On January 21, 1992, Royal also confessed judgment in the amount of $1,981,140.48 against the Debtors and thereby obtained an additional lien in that amount on the Plaza. The only evidence regarding the value of the Plaza in the record was the Husband's testimony at the May 19, 1993, hearing that its value was "somewhere between $1,400,000 and $1,700,000."

In calculating the balance allegedly owed to it on Royal's first mortgage on the Plaza as of June 30, 1993, in its proof of claim, Royal stated as follows:

| | |
|---|---|
| Current Outstanding Balance | $738,263.95 |
| Accrued Interest from 12/1/91 through 6/30/93 at the default rate of 14.25% | 163,290.01 |
| Late Charges | 25,327.86 |
| Compensating Balance | 4,404.64 |
| Miscellaneous Fees | 7,482.23 |
| | $938,768.69 |

---

On August 24, 1992, Royal filed a motion for relief from the automatic stay, seeking to foreclose upon the Lansdale real estate secured by its mortgage and the Plaza. On August 28, 1992, Royal filed a motion to prohibit the Debtors' further use of its alleged cash collateral and to seek the turnover of rents from both properties to it. Both motions were scheduled for hearings on an expedited basis on September 2, 1992.

On the date of the hearings on these motions, counsel for the Debtors and for Royal appeared and announced that they had settled their differences. The terms set forth were that the Debtors' Lansdale property would be released from the automatic stay and the Debtors would recognize the validity and enforceability of the CC Agreement in exchange for an opportunity to propose a Plan of Reorganization allowing them to retain the Plaza and an agreement by Royal to limit its secured claim against the Plaza to the outstanding

indebtedness due on the Plaza mortgage plus $100,000.00 from the anticipated deficiency of a far greater amount which Royal would otherwise realize after its disposition of the Lansdale property.

However, because of this agreement's perceived impact upon other creditors and on the future of the Debtors' plan-formulation process, this court required that a Motion to approve the settlement agreement ("the Settlement") be filed, pursuant to F.R.B.P. 9019, with notice to all creditors, before this court would approve it. Accordingly, notice was given to all creditors, including HNB, whose name appears on the Certification of Service of this Motion filed on September 11, 1992. When no objections to the Settlement were received, a Certificate of No Response to Motion to Approve Compromise of Controversy, dated October 6, 1992, was filed by Royal. On October 8, 1992, an Order was entered approving same.

**560**

### D. DISCUSSION

1. *HNB CANNOT SUCCESSFULLY ATTACK THE CC AGREEMENT OF ROYAL, SINCE IT CAN PROCEED ONLY IN THE SHOES OF THE DEBTORS IN SO DOING, AND THE DEBTORS ARE BOUND BY THE POST–PETITION SETTLEMENT ORDER VALIDATING THE CC AGREEMENT.*

In attacking Royal's claim arising out of the Plaza Transaction, HNB argues that the CC Agreement, being unrecorded, is unenforceable as to it. It therefore concludes that the only valid security interest in the Plaza with priority as to its own second mortgage on the Plaza is Royal's first mortgage. Without stating a specific alternative figure, it further argues that Royal's $938,768.89 claim based on its first mortgage is bloated with excessive interest and late charges, as well as inscrutable entries for "miscellaneous fees" and "compensating balance." Given the $1,400,000 to $1,700,000 value range of the Plaza, it envisions its having a valid security interest of between $600,000 and $900,000 in the Plaza. The Debtor's 4th Plan, contemplating a payment to it totalling $725,000 on account of a claim secured by both its second mortgage in the Plaza and the $422,000 proceeds of the Menkowitz Note, is therefore argued to be significantly less than "fair and equitable" in its treatment of HNB's interests.

Neither HNB nor any other interested parties devote significant attention to the ultimately very important issue of by what right and under what Code provisions HNB asserts this challenge to Royal's claim. We note that its standing to attack the proof of claim of another creditor, as a creditor which has not obtained permission of the court to do so, is doubtful.

However, in *In re Morrison*, 69 B.R. 586, 588–90 (Bankr.E.D.Pa.1987), while acknowledging considerable authority to the contrary, we allowed a similarly-situated creditor to overcome the standing hurdle. And, although we have, again contrary to much authority, continued in a policy of liberal allowance of creditors to bring suits on

behalf of debtors, we have noted that such actions must be maintained on behalf of debtors, if not necessarily in the debtors' names, and only after receiving permission of the court to proceed in lieu of the debtor's in doing so. *See In re Lease–A–Fleet, Inc.*, 155 B.R. 666, 670 (Bankr.E.D.Pa. June 17, 1993); and *In re Nicolet, Inc.*, 80 B.R. 733, 738–39 (Bankr.E.D.Pa.1987).

It is also important to focus upon the provisions of the Bankruptcy Code which permit such an attack on a creditor's claim to be made. Although neither HNB nor any other interested party has made any such analysis, it is apparent to us that HNB can proceed only if it is invoking the "strong arm" powers of 11 U.S.C. § 544. *Compare Morrison, supra,* 69 B.R. at 589–90. Were it not so proceeding, it would be fairly obvious that the CC Agreement, being an apparently valid contract between the Debtors and Royal, would be impervious to attack. It is only when HNB stands in the shoes of an ideal judgment creditor or lien creditor, or of a bona fide purchaser, pursuant to § 544(a), which only a trustee or a debtor-in-possession ("DIP"), 11 U.S.C. § 1107(a), are expressly authorized to wear, that any sort of effective attack on Royal's secured claim can be made by HNB.

The difficulty with the instant attack levelled upon Royal's claim by HNB, even from the exalted stance arising from § 544, is that the Debtors themselves have agreed that the CC Agreement is valid in the Settlement. The Settlement was entered into in circumstances which were not ideal from the Debtors' standpoint, but were not, in our view, not such as to render the Settlement invalid for lack of consideration or conscionability. In the Settlement, Royal gave up certain claims and paved the way for the Debtors to achieve confirmation of a plan. In such circumstances, a trustee, let alone another creditor of a DIP, is bound by the post-petition undertaking of the DIP which validates the security agreement of a secured creditor in accordance with the parties' agreement. *See Armstrong v. Norwest Bank*, 964 F.2d 797,

801 (8th Cir.1992); *In re Sherwood Ford, Inc.*, 125 B.R. 957, 961 (Bankr.D.Md.1991); and *In re American Int'l Airways, Inc.*, 75 B.R. 1023 (Bankr.E.D.Pa.1987).

We also note that HNB itself was provided with notice of the pendency of the Stipulation before the court approved it. The very purpose of F.R.B.P. 9019 is to provide creditors and other interested parties with an opportunity to object to stipulations which may unfairly adversely affect their interests. As is stated at 9 COLLIER ON BANKRUPTCY, ¶ 9019.03, at 9019–6 (15th ed. 1993), "[a] compromise effected with the approval of the court is conclusive on the parties *and on the creditors of the estate as well*" (emphasis added).

This court must express its concern that, despite HNB's failure to raise the issue, Royal failed to properly make the Settlement a part of this record, as is necessary for us to consider it, per the holding in *In re Aughenbaugh*, 125 F.2d 887, 889 (3rd Cir.1942); and *Nicolet, supra*, 80 B.R. at 742–44. It was not included as an exhibit to, nor even mentioned in, either of the Stipulations of Facts. However, the Settlement's presence was identified by the Husband at the hearing of May 19, 1993, the record of which was incorporated into the instant record. In our opinion, this invocation is sufficient to bring the Settlement into this record. Royal has certainly not sought to incorporate the entire case file of this bankruptcy into this record, as did the *Nicolet* debtor, but only a small, discrete portion thereof.

We also took steps to cure any possible unfair prejudice to HNB from its possible unawareness of the Settlement's existence or its potential significance by allowing HNB to file an additional brief in rebuttal to that of Royal on the issue of the effect of the Settlement. However, the only responses of HNB to Royal's argument that the Settlement foreclosed its attack upon the CC Agreement were contentions that (1) it was uncertain whether it had been served with notice of the filing of the Settlement; and (2) the Settlement bound only the Debtor, and not creditors, such as HNB itself, to its terms.

One response to HNB's first argument is that the Certification of Service unequivocally states that HNB was served with notice of the motion requesting this court to approve the Settlement. There is a presumption that mail notice sent to a party has been received by it. *See Hagner v. United States*, 285 U.S. 427, 430, 52 S.Ct. 417, 418–19, 76 L.Ed. 861 (1932); and *In re Ryan*, 54 B.R. 105, 106–07 (Bankr. E.D.Pa.1985). However, another response is that HNB, standing as it must in the shoes of the Debtors under 11 U.S.C. § 544, is bound by their post-petition actions in any event, irrespective of whether it had notice of the Settlement.

This recognition that HNB is proceeding in the shoes of the Debtors also renders its second argument inconsequential. If the Debtors, qua DIPs, are bound by the terms of the Settlement, then they cannot be extricated from it by a creditor which is necessarily stepping into their shoes in challenging it.

HNB therefore cannot succeed in attacking Royal's secured claim by means of its only potent argument, *i.e.*, that the CC Agreement was not properly recorded. The post-petition validation of the CC Agreement via the Settlement renders it impregnable to attack.

Royal is therefore shown to have a valid secured claim which exceeds the value of the Plaza. Its significant compromise of this position in accepting the Plan is, therefore, hardly an indicia of its receiving favored treatment vis-a-vis HNB in the 4th Plan. Indeed, even assuming *arguendo* the validity of HNB's security interest arising out of the Menkowitz Transaction, the treatment of HNB in the 4th Plan was quite generous.

We shall now explore the issue of the validity of HNB's separate purported security interest in the proceeds of the Menkowitz Note.

### 2. *HNB'S PRE–PETITION SECURITY INTERESTS IN THE MENKOWITZ NOTE ARE AVOIDABLE.*

The Debtors attack HNB's purported security interest in the proceeds of the Men-

kowitz Note on the following four separate grounds: (1) the Debtors' right to receive the proceeds of the Note was assigned to Mellon prior to HNB's garnishment of it in their hands, rendering that garnishment ineffectual; (2) HNB never had possession of the Note, as is necessary to perfect a security interest in it; (3) the judgment entered against Menkowitz is void, because Menkowitz, in their answers to the interrogatories in garnishment, never admitted to owing a personal liability to the Debtors; and (4) HNB voluntarily dissolved the attachment in the course of negotiations with the Debtors regarding their initial plan on September 4, 1992, eliminating any security interest which it may have had therein.

In its brief in response to that of the Debtors on the issue of the validity of the Menkowitz Note, HNB makes the following arguments in response to the foregoing: (1) the Debtors' assignment of their right to the Menkowitz' payments was not a "full assignment," but was merely an agreement to be triggered by the Debtors' failure to make current payment to Mellon, a contingency which never occurred. In addition, Menkowitz kept making payments to the Debtors, contrary to the terms of the assignment; (2) as the Agreements purportedly articulated, HNB received a security interest in the "flow of money" from Menkowitz to the Debtors, not the Mortgage and Note *per se;* and (3) HNB was "outranged [sic] and offended" by the Debtors' attempt to benefit from its voluntary dissolution of the attachment in light of the agreement by the Debtors' counsel that the release of the attachment for the Debtors' benefit would not in any way affect HNB's rights against the Debtors.

■ We will begin our analysis by considering the validity of the judgment in attachment against Menkowitz, an issue not addressed by HNB in its responsive brief. In *In re Garafano,* 99 B.R. 624, 629–34 (Bankr.E.D.Pa.1989), we articulated the general rule that, in considering objections to a proof of claim, a bankruptcy court is generally bound by previous decisions of courts of competent jurisdiction on the subject matter of the claim. *See also,*

*e.g., Heiser v. Woodruff,* 327 U.S. 726, 733, 66 S.Ct. 853, 856, 90 L.Ed. 970 (1946). However, we noted, in *Garafano,* that this principle is not "rigidly applied" and that a bankruptcy court is not obliged, for example, to enforce a judgment that is based on a confessed judgment which was entered in violation of the defendant's due process rights. *Id.* at 633, citing *In re Souders,* 75 B.R. 427, 433–38 (Bankr.E.D.Pa.1987).

The judgment which underlies HNB's claim of a security interest in the Menkowitz Note is a judgment entered by confession against the Debtors. We note that the record is barren of any evidence that the confession clause in the HNB documents was "negotiated and specifically agreed upon" by the Debtors, or that the Debtors were "represented by counsel" in the negotiation process. *See In re Road Patch Services, Inc.,* 154 B.R. 869, 872 (Bankr. E.D.Pa.1993), quoting *In re FRG, Inc.,* 919 F.2d 850, 857 (3rd Cir.1990).

We note that the Debtors did not focus on the invalidity of the entry of judgment against them, but on the entry of the judgment in attachment against Menkowitz. We agree that the binding effect of this judgment, having been entered on equivocal answers to garnishment interrogatories by parties not particularly concerned about the effect of their answers in a non-adversarial context, is questionable. Therefore, the foundation upon which HNB makes its claims of a security interest is weak.

■ More significant is our total agreement with the Debtors in their contention that their assignment of their rights in the Menkowitz Note to Mellon, prior to the attachment of these same rights by HNB, invalidates the attachment. In *In re Lease–A–Fleet, Inc.,* 141 B.R. 853, 861 (Bankr.E.D.P.1992), we defined an assignment as " '[a] transfer or making over to another of the whole of any property, real or personal, in possession or in action, or of any estate or right therein,' " quoting BLACK'S LAW DICTIONARY 109 (5th ed. 1979). There, underscoring the "absolute and complete nature" of an assignment, we stated that, upon assignment, the rights of the assignor become vested in the assignee

and the debtor is justified in paying the assignee, not the assignor, on the assigned claim. *Id.* at 861–62. *See also Brager v. Blum*, 49 B.R. 626, 629 (E.D.Pa.1985); and *In re Robert T. Noel Coal, Inc.*, 82 B.R. 778, 780 (Bankr.W.D.Pa.1988).

■ There is no question, as there was in *Lease-A-Fleet, supra*, 141 B.R. at 862, that the assignment at issue here is valid. There was a written Assignment Agreement between Mellon and the Debtors. In fact, HNB does not contest the validity of the Assignment *per se*. Also, it does not dispute the fact that it served attachment papers on Menkowitz on September 12, 1991, over one year after the Debtors executed their Assignment to Mellon on September 1, 1990. The effect of this undisputed fact, as the Debtors correctly argue, is that, at the time the attachment was served, the garnishees owed a debt to Mellon, not the Debtors. Under Pennsylvania law, "[i]f before the attachment is served the debtor has made a valid assignment of the money due from the garnishee or of the fund or property in its hands, judgment cannot be entered against the garnishee." *Guarantee Trust & Safe Deposit Co. v. Tye*, 129 Pa.Super. 481, 485, 196 A. 618, 620 (1938). *See also Royal Bank of PA. v. Selig*, No. 90–12652, slip op. at 17 (Montg. Co. C.P. July 21, 1993).

■ Rather than contest the validity of the assignment to Mellon as such, HNB argues (1) that the assignment was conditioned upon the Debtors' default, which had not occurred as of the date HNB served the attachment papers on the garnishees; and (2) the Debtors received money from the garnishees following the assignment. In short, the disagreement turns on whether these apparent "irregularities" rise to the level of rendering an otherwise valid assignment invalid.

We do not think that they do. To be sure, we find the Debtors' explanation that "Mellon was receiving payments on account of the Note, albeit in a roundabout fashion" not very persuasive. However, we do not think that small infractions like the Menkowitz' making certain payments to the Debtors rather than to Mellon after the assignment, which affect neither the assignment's irrevocability nor its nature as an instrument of complete transfer of rights, mortally jeopardize, to the point of invalidity, an otherwise valid assignment. *See Noel Coal, supra*, 82 B.R. at 780 (legal conclusion of bankruptcy debtor-assignor regarding the potential invalidity of its assignment was insufficient to invalidate the effect of a court-ordered assignment). The fact that Menkowitz, for a brief period (of probably no more than one month) after HNB entered judgment against them, forwarded their monthly payment directly to HNB does not change this result. Moreover, we note that Mellon made a quick reaction to this payment, claiming "an immediate right" to receive the monthly mortgage payments, which led to the Agreements between HNB, Mellon, and the Debtors.

Consideration of the legal effect of the Agreements leads us to consider an argument not made by HNB. The argument is that, irrespective of the strength or weakness of HNB's claims as of the date of the Agreements, the terms of the Agreements themselves purport to give it certain rights which arguably are unaffected by the weaknesses in the legal position of HNB prior to their entry.

This argument is similar to that upon which Royal prevailed in defending against HNB's attacks on its proof of claim. We held, in that instance, that the strength of the Settlement upholding the validity of the CC Agreement rendered the CC Agreement valid, irrespective of the legal weakness of the CC Agreement on its own.

However, there is one major difference between the Settlement which preserved Royal's rights in the Plaza Transaction and the instant Agreements. The Settlement was entered into by the Debtors post-petition, and was thereafter approved by this court only after notice to all interested parties, including HNB. As such, it was not subject to attack by the Debtors or any other parties standing in their shoes under 11 U.S.C. § 544. By way of contrast, the Agreements in issue in the Menkowitz

Transaction were pre-petition Stipulations, which *are* subject to attack by the Debtors, standing in the shoes of an ideal judgment creditor or lien creditor or a bona fide purchaser for value, pursuant to 11 U.S.C. § 544(a).

With these principles firmly in mind, we consider the Debtors' contention that HNB has not properly perfected its purported security interest in the Menkowitz Note or its proceeds. Whatever flaws might exist in the Debtors' other arguments, this classic § 544 argument is successful in striking to the heart of HNB's claim of secured status in the Menkowitz Transaction.

■ The Pennsylvania Uniform Commercial Code, 13 Pa.C.S. §§ 9304(a), 9305, provides that a security interest in instruments (such as the Menkowitz Note) or in money (such as the proceeds of the Menkowitz Note) must be perfected as follows:

§ 9304. Perfection of security in instruments, documents and goods covered by documents; perfection by permissive filing; temporary perfection without filing or transfer of possession

(a) Chattel paper, a negotiable documents, money and instruments.—A security interest in chattel paper or negotiable documents may be perfected by filing. A security interest in money or instruments (other than instruments which constitute part of chattel paper) can be perfected only by the secured party's taking possession, . . .

.   .   .   .   .

§ 9305. When possession by secured party perfects security interest without filing

A security interest in . . . goods, instruments, money, negotiable documents or chattel paper may be perfected by the secured party's taking possession of the collateral. . . . A security interest is perfected by possession from the time possession is taken without relation back and continues only so long as possession is retained, unless otherwise specified in this division. . . .

*See also, e.g., Selig, supra,* slip op. at 18–23; and *In re Investors & Lenders, Ltd.,* 156 B.R. 145, 148, 24 B.C.D. 685, 686–87 (Bankr.D.N.J.1993) (possession of copies of notes does not constitute perfection of security interest in notes).

HNB has not established that it ever filed the Agreements, as it would a security agreement. *See* 13 Pa.C.S. § 9401. *Cf. In re O'Hara Bros.,* 151 B.R. 702, 705–06 (Bankr.E.D.Pa.1993). It has not alleged that it ever took actual possession of the Menkowitz Note or Mortgage, nor of any of the proceeds from the "flow of money" arising therefrom. Apparently, the Debtors are holding the proceeds and proposing to utilize them to fund the 4th Plan. Any rights of HNB arising out of the Agreements are therefore readily avoidable by the Debtors under § 544.

We therefore conclude that HNB has no valid security interest in the Menkowitz Note or its proceeds pursuant to the Agreements or the defective attachment proceedings which preceded the Agreements. Consequently, we need not discuss the issue of whether HNB's voluntary dissolution of its attachment must be held to have permanently invalidated it. We do note that, since the underlying attachment was invalid in any event, HNB would be unable to establish that the Debtors could be equitably estopped from denying the validity of the attachment. *See, e.g., In re Webb,* 99 B.R. 283, 290 (Bankr.E.D.Pa.1989) (party asserting estoppel must establish injury, detriment, or prejudice to it as a result of the actions allegedly creating the estoppel). It is not clear, in any event, that HNB could overcome the fact that the automatic stay would bar the re-entry of the attachment, or that it could overcome the authority that, under the Bankruptcy Code, reinstatement of a security interest on equitable grounds once it has been dissolved is impermissible. *Cf. In re Cavalieri,* 142 B.R. 710, 718–19 (Bankr.E.D.Pa.1992).

We therefore conclude that the Debtors' attack upon the validity of HNB's security interest in the proceeds of the Menkowitz Note must succeed.

3. *AS A RESULT OF THE FOREGOING CONCLUSIONS, HNB'S OBJECTIONS TO CONFIRMATION OF THE 4TH PLAN MUST BE OVERRULED AND ITS MOTION FOR RELIEF FROM THE AUTOMATIC STAY MUST BE DENIED.*

HNB's Objections to confirmation of the 4th Plan, while lengthy in text, boil down to assertions that it has valuable and viable security interests in the Plaza and in the Menkowitz Note, and that, in light of these security interests, the 4th Plan fails to provide it with "fair and equitable" treatment. Since we find that HNB in fact has no valid security interest in the Menkowitz Note or its proceeds, and it cannot successfully reduce, to any significant degree, the prior secured claim of $2,644,872.61 of Royal against the Plaza, which in any event far exceeds the value of the Plaza, all that HNB is left with is a totally undersecured and hence an effectively unsecured claim against the Plaza.

The Debtors' treatment of HNB's claim in the 4th Plan, which provides it with at least the rights of a partially-secured claim holder, is, therefore, very generous in substance. As a result, we conclude that the 4th Plan can be confirmed under 11 U.S.C. § 1129(b)(2)(A)(i) irrespective of the rejecting vote and Objections of HNB. The 4th Plan contemplates HNB's retention of its lien and payments to it of $150,000 on the effective date and $575,000 thereafter, amounts far in excess of the value of HNB's interest in the interest of the Debtors' estate in the Plaza under 11 U.S.C. § 506(a), which is arguably zero (0).

The avoidability of HNB's security interests in property of the Debtor's estate, *see In re Hunt's Pier Associates,* 143 B.R. 36, 49–50 (Bankr.E.D.Pa.1992), as well as the adequacy of the protection of HNB's interests by confirmation of an effective reorganizational plan, eliminates any basis for granting HNB relief from the automatic stay under 11 U.S.C. § 362(d).

## D. CONCLUSION

An Order consistent with the conclusions reached in this Opinion will be entered.

## ORDER

AND NOW, this 5th day of August, 1993, upon consideration of the record made at the hearing of May 19, 1993, to consider confirmation of the Debtors' Third Modified Chapter 11 Plan of Reorganization, and the Stipulations of Facts which, with the foregoing hearing testimony, the parties agreed would constitute the record upon consideration of confirmation of the Debtors' Fourth Modified Chapter 11 Plan of Reorganization ("the 4th Plan"); the Debtors' Objections ("the Debtors' Objections") to the Proof of Claim filed by Harleysville National Bank & Trust Co. ("HNB") (No. 28); HNB's motion for relief from the automatic stay ("the Stay Motion"); and HNB's Objections ("HNB's Objections") to the Proof of Claim filed by Royal Bank of PA ("Royal") (No. 29), it is ORDERED AND DECREED as follows:

1. HNB's Objections are DENIED. The secured claim of Royal is allowed as filed.

2. The Debtors' Objections are SUSTAINED. HNB's claim of $1,065,573.32 is determined to be an unsecured claim in that amount.

3. The Objections of HNB to confirmation are OVERRULED, and the 4th Plan is CONFIRMED.

4. The Stay Motion is DENIED.